MAY DEPARTMENT STORES COMPANY, Appellant, v. UNION ELECTRIC LIGHT & POWER COMPANY and CUPPLES STATION LIGHT, HEAT & POWER COMPANY.—107 S. W. (2d) 41.

Division One, June 30, 1937.*

*NOTE: Opinion filed at September Term, 1936, April 21, 1937; motion for rehearing filed; motion overruled at May Term, 1937, June 30, 1937.

300

*Edward A. Haid, Sullivan, Reeder & Finley* and *Lewis, Rice, Tucker, Allen & Chubb* for appellant.

*McCammon & Sandison, Taylor Sandison* and *John P. McCammon* for respondents.

HYDE, C.—This is an action in equity for an accounting for the purpose of ascertaining and recovering alleged overcharges for electricity. An injunction against future excess charges was also sought. It was stated that the exact amount collected from plaintiff, in excess of lawful rates (filed with and approved by the Public Service Commission), could only be determined from meter readings in the sole possession of defendants; but that the total excess charges, for a six-year period from April 30, 1924, were in excess of $400,000. Suit was commenced May 2, 1930. A referee was appointed (Hon. Charles P. Williams), who heard the evidence, reported findings of fact and conclusions of law, and recommended a judgment for plaintiff for $111,938.54. Exceptions to findings of facts and rulings of law were filed to this report by both parties. The trial court overruled plaintiff's exceptions, sustained defendants' exceptions, and entered judgment dismissing plaintiff's bill. From this judgment plaintiff has appealed.

The contracts and leases, out of which this case arose, as well as the case of Railway Exchange Building v. The Light & Development Company, 341 Mo. 334, 107 S. W. (2d) 59, decided concurrently herewith, were entered into, because of the construction of the Railway Exchange Building, in 1912. Our Public Service Commission Act became effective April 15, 1913. We will make a statement here for both cases, since it is stipulated "that all the oral and documentary evidence and the pleadings in each of said causes may be considered so far as they may be material in the other." The corporations involved will be hereinafter referred to, as follows: The May Department Stores Company as May; the Railway Exchange Building Company as Railway; the Light & Development Company (referred to in the contracts as the Plant Company) as Development; the Cupples Station Light, Heat & Power Company as Cupples; Union Electric Light & Power Company as Union; and the Kingston Investment Company as Kingston. May was to occupy the basement and the seven lower floors of the new building, which was to cover the entire block between Olive and Locust and Sixth and Seventh streets in the city of St. Louis. Storage, loading facilities, heat, light, and power were to be furnished in a building on the north side of Locust Street, and Kingston's property, adjoining this building on the north, on the corner of Seventh and St. Charles streets. Kingston was a subsidiary of May.

The petition states and the evidence shows that following contracts and leases were made for the purpose of accomplishing these purposes:

### A Contract between Kingston, May and Railway.

This contract provided for a new building on the Kingston property suitable for storing merchandise, the construction of a tunnel under Locust Street, and a suitable location in the Kingston building for an electric light, power, and steam plant. May and Railway were to pay for, own, and maintain the conduits, wires and pipes necessary for their service. May was to have a lease for the Kingston Building but it was provided that it should sublet to Development "space . . . suitable for the installation, maintenance and operation of a plant or plants adequate to furnish light, heat and power" for both buildings; and that May "will cause its sublease to require (on penalty of forfeiture) that the Plant Company shall at its own expense install, operate and maintain in said leased space, such a plant or plants with a sufficient reserve or excess in capacity to provide such reasonable security against suspensions in service, as will conform to good engineering practice." It was further provided that Railway, upon failure of the Plant Company "to furnish and

maintain an adequate supply of light, heat or power," should have the right to purchase the plant.

### A lease from Kingston to May.

This lease rented to May the storage building to be erected by Kingston and contained provisions, concerning the location of a light, heat and power plant therein, similar to those above mentioned.

### A lease from May to Development.

This lease provided that May would cause certain construction and alterations, in the Kingston building leased to it, "to constitute premises suitable for the construction, installation, maintenance and operation therein of a modern first-class light, heat and power plant, adequate and suitable to supply all of the light, heat and power which may be required for the Railway Exchange Building and its tenants, as well as for all other customers of the Plant Company." This lease required Development to "install, operate, and maintain in said leased space, a new, modern, first-class power, lighting and heating plant of capacity sufficient to supply all of the electric current for light and power and steam for heat and for heating hot water, which may be required by the Railway Exchange Building, and by any of its tenants, in addition to the requirements of all other customers of the Plant Company, said plant to have a sufficient reserve or excess in capacity to provide such reasonable security against suspensions in service as will conform to good engineering practice; and . . . at all times during the life of this lease maintain in said plant premises a plant equipment of the character and capacity above described." There were also provisions for the forfeiture of the lease upon violation of its covenants or agreements. The right to sublet, to a "public service corporation satisfactory to the lessor" and to Railway, was also granted to Development but the sublessee was to be required to give bond for its performance.

### A contract between May and Development.

This is the service contract, which is directly involved in this controversy. Defendants claim that it settles the rights of the parties as to charges and that was the circuit court's view. This contract recited that May "is desirous of providing for its use electricity for light, heat and power and steam" (for various named purposes), and that Development "will erect, own and operate a steam and electric plant" located in the premises (of the Kingston property) leased to it by May. It then stated:

"First: The Plant Company agrees to furnish to the May Company its entire requirements of electric current for electric light, heat and power purposes and steam for heating the premises and for heating water for toilet and cleaning purposes and high pressure

steam for cooking and other purposes during the term of this contract. Said plant, which shall be constructed and operated by the Plant Company as hereinbefore recited, shall be a new, modern, first class power, lighting and heating plant of capacity sufficient to supply all of the electric current for light and power and steam for heat and heating hot water as well as steam for cooking and other purposes, as above stated, for the May Company. . . .

"Second: The Plant Company agrees to maintain its electric service in such a way as to supply at all hours of the day or night (except when prevented by act of God or other causes not due to neglect or fault of the Plant Company) an adequate, continued and uninterrupted supply of electric current as may be required by the May Company, such service to be delivered at the switchboard of the Plant Company in the engine room of the Plant Company in City Block No. 127. The Plant Company further agrees to furnish an adequate, continued and uninterrupted supply of low pressure steam of not to exceed 2 lbs. gauge pressure (except as herein otherwise provided) as above specified as and when required during the heating season from October 1st to May 1st of each year by the May Company for its use for heating its premises, and a supply of low pressure steam for heating water for toilet and cleaning purposes as well as a supply of high pressure steam for cooking and other purposes as and when required by the May Company for its use during the heating season and from 7 A. M. to 6 P. M. of all working days from May 1st to October 1st of each year, such steam service to be delivered to steam header in engine room of the Plant Company. . . .

"Third: The May Company agrees to take from the Plant Company its entire requirements of electric service and steam for heat for its premises as above described."

It was further provided that, during the life of the contract, May would "take and pay for electric service, when accompanied by the additional service to be furnished hereunder, an amount per annum of not less than one million five hundred thousand (1,500,000) kilowatt hours." Provisions as to rates are hereinafter set out.

### A contract between Railway and Development.

This was also a service contract with provisions, as to furnishing electricity and steam, similar to those of the May service contract. It is the basis of the action in Railway Exchange Building v. The Light & Development Company, supra, and is further discussed therein.

The term of all these leases and contracts was forty years and there were certain renewal privileges granted. Other relevant provisions contained therein will be referred to later in this opinion.

Development was permitted, under these contracts to serve other customers from the Railway plant. Development was a holding company and apparently intended to assign this contract to its operating company as soon as it was made. Some of the principal stockholders (also directors) of May were among the largest stockholders of Development and served on its board of directors. Since many of the referee's findings of fact were not excepted to, we will take his findings as to such matters as undisputed facts. (Some facts were also stipulated.) As to controverted facts, this being an equity case, we are free to make our own findings, being bound neither by the view of the referee nor that of the trial court. [Shaw v. Butler (Mo.), 78 S. W. (2d) 420.] Especially must we do so where much of the evidence is documentary and the chancellor and the referee do not agree. For reasons hereinafter more fully discussed, we find the situation, disclosed by the facts stated in the petition and supported by evidence (if accepted as true), sufficient to make a case for the equitable relief of an accounting for unlawful overcharges. [Dahlberg v. Fisse, 328 Mo. 213, 40 S. W. (2d) 606; Kansas City Power & Light Co. v. Midland Realty Co., 338 Mo. 1141, 93 S. W. (2d) 954, affirmed 57 Sup. Ct. 345, 81 L. Ed. 290.]

The Railway and Kingston buildings were built in 1912, the electric and heating plant was installed, and the connecting tunnel was constructed. The actual operation of the plant was begun by Cupples. The exact time when this commenced does not appear, but in 1912 Development became the owner of all the capital stock of Cupples; and, by a contract dated February 20, 1913, between Development and the Phoenix Light, Heat & Power Company, arrangements were made for Phoenix to supply "all the electrical energy for power and light" which Development "might require for the use of its two plants," between May 1 and October 1 of each year. These were the Railway plant and the Cupples Station plant. This latter plant furnished electric current for light and power, steam for heating, and other service to buildings, near its location, belonging to Washington University. The Phoenix contract also provided that between October 1 and May 1 of each year Phoenix would furnish "such electrical energy for light and Power" as Development "might desire to take for use at its two plants." The maximum limit to be furnished to both plants at any time was set at 1500 Kilowatts. For installation of converter or substation equipment to comply with this contract, Development sublet to Phoenix space (approximately twelve feet by thirty-two feet) in the Railway plant. At this time, Cupples operated another large plant called the Heine plant, and two or three smaller plants. The three large plants were tied together and operated harmoniously so that current generated from all three went into the Cupples system during the daytime. In the nighttime, the

Railway plant served the entire Cupples system in the city and also furnished current to a Development subsidiary in the county.

From 1912 to 1923, Cupples continued to operate in this manner. Its city customers were mainly in the downtown district; it had 123 attached to the Railway plant, 122 to the Heine plant, and 68 to the Cupples Station plant. The referee found that "the Cupples Company also owned and used in serving its customers, approximately 186, 152 duct feet (equivalent to $34\frac{1}{4}$ miles) of subway, and approximately 100,086 conductor feet (equivalent to about 189/10 miles) of underground cables. . . . A very considerable overhead or pole system of lines." The referee also found that during this period "the energy furnished (to May and Railway) came in undefinable part from other major plants such as the Cupples Station plant and the Heine plant, as well as from the purchases from the Barnes Hospital plant and from the Phoenix Company;" that "until the making of arrangements with Barnes Hospital (some time subsequent to the Phoenix contract) the Cupples Company had for some time been badly overloaded in endeavoring to take care of all its customers;" that "after making of the Barnes Hospital arrangements, it lacked ideal reserve capacity, . . . was seeking no new customers;" and that "to insure itself against overload and possible temporary breakdown . . . was proposing to erect another plant." The referee further found "the Railway Exchange plant had four boilers arranged in two batteries of two boilers each. These boilers had a total steam capacity of around 100,000 pounds per hour. The entire steam requirements of the Building Company and the May Company did not exceed approximately 40,000 per hour. . . . The Railway Exchange plant was engaged . . . in the production of high and low pressure steam; and it appears that the plant purchased no steam from outside sources."

The referee's report shows the following concerning the financial condition of Cupples:

"The report for the year ending December 31, 1922, shows the total depreciated fixed assets of the Cupples Company as being $1,569,251.08; its current assets were $130,270.08; its prepayments were $6,032.41 making total assets of $1,705,553.57. Its current liabilities were $486,101.12, in which the largest item was under the head of 'Notes Payable' in the sum of $426,544.32. . . . For the year 1922, the net operating revenue of the Cupples Company was $393,202.73. Of this amount $132,653.61 was received from customers who were supplied with light and power under permits secured from the franchises of the Cupples Company. The balance of the revenue was obtained from the operation of isolated plants. The net profit for all operations for the year 1922, appears to have been $40,565.49."

In 1923 Development sold the capital stock of Cupples to Union. [Sec. 13, P. S. C. Mo. 507.] As may be noted from this report, the North American Company, which owned the capital stock of the Holding Company that was the owner of the capital stock of Union, had previously purchased the capital stock of Development, the Holding Company of Cupples. Union was and is an operating company, and its was authorized to purchase the stock of Cupples and Development's other operating subsidiaries on the theory that unified control would be more economical and result in better and cheaper service. Plaintiff seeks to recover alleged overcharges for all electricity and steam furnished after April 30, 1924, on the theory that after that time the applicable rates were the rates of Union, filed with and approved by the Public Service Commission. Plaintiff contends that Union destroyed the separate corporate entity of Cupples, made it a mere instrumentality or department of Union, and that the service received was therefore actually Union service. Plaintiff further contends that Union rates fully cover the service contracted for and rendered, and are much less than the contract rates. Defendants' contention is that the contract rates apply and that nothing has happened since the contract was executed which could make any other rates supersede the contract rates. Plaintiff apparently could gain nothing by claiming scheduled rates of Cupples (if Statute of Limitations would permit) prior to that date, because it seems that the contract rates were lower than any applicable rates ever filed by Cupples.

The May service contract provisions *as to rates* were, as follows:

"Fifth: The May Company agrees that it will pay the Plant Company (which will accept) for the service furnished under this contract at the rate of Two and One-Fourth Cents (2¼c) per kilowatt hour of electric current delivered plus a flat payment of Two Thousand Dollars ($2,000.00) per year and for which rate or price for electric current there shall also be furnished without additional compensation an adequate supply of low pressure steam for heating the premises during the heating season and for heating water for toilet and cleaning purposes as well as high pressure steam for cooking and other purposes, all in amount and time as hereinbefore set forth. . . .

"Eighth: It is further understood and agreed by and between the parties hereunto that while the price of Two and One-Fourth (2¼c) per kilowatt hours shall be the price to be charged for service under this contract and beginning at the time this contract goes into effect, nevertheless said price per kilowatt hour shall be subject to revision and adjustment from time to time during the life of this contract at the end of each five year period thereof, such adjustment to be made on a basis of comparative cost of adequate fuel, taking as the present standard Belleville shaker lump coal screened through

a one and one-half inch (1½″) screen at Two Dollars ($2.00) per ton delivered at the Plant Company's premises and having a heating value of ten thousand five hundred (10,500) B.T.U. per pound of coal. Should the cost of the cheapest adequate fuel at any such adjustment period be greater than the cost herein established as the present standard then the price for service hereunder per kilowatt hour during the five year period or portion thereof then ensuing shall be increased in percentage equal to one-half the percentage of said increase in cost of fuel. Should the cost of the cheapest adequate fuel at any such adjustment period be less than the cost herein established as the present standard then the cost for service hereunder per kilowatt hour shall be decreased in percentage equal to one-half the percentage of decrease in cost of fuel."

■ Plaintiff sued on the theory that the contract rate per kilowatt hour only covered electricity and that steam was to be furnished at the flat rate of $2000.00 per year. The referee construed the contract (we hold correctly) to mean that the total payments covered both steam and electricity; and that "repayment to which plaintiff is equitably entitled is the difference between the tariff rates for electricity and for steam, and what plaintiff paid under, and in reliance upon, the contract for both." There were other provisions concerning rates for steam in excess of 200,000 pounds per month between May 1 and October 1 of any year; and concerning equipment to be furnished by each party. In accordance with the provision for adjustment, after each five-year period the rates were changed and fixed for next five-year period upon the agreed basis. There does not seem to have been any real disagreement about these adjustments until in July, 1929, six years after Union purchased Cupples. One such adjustment was made after this purchase. As to this adjustment the referee's report shows that, in 1923, "the price for electricity (and appurtenant steam) was 4.25 cents per kilowatt hour;" that "this remained the rate under the contract until May 1, 1924;" that thereafter "the rate was reduced to 3.625 cents per kilowatt hour; and that "this rate remained in effect until May 1, 1929." He further found that "at the expiration of this five year period, in 1929, the parties were inextricably in dispute and there was no agreement arrived at between them as to any price to be charged under the service contract for the succeeding five year period;" but that "apparently the Cupples Company or the Union Company made the best estimate they could and reduced the rate under the contract to 3.2 cents per kilowatt hour;" and that plaintiff has paid this rate under protest.

In less than a year after these leases and contracts were made, the Missouri Public Service Commission Law was enacted. The first question for consideration is: What was the effect of this law upon these

contracts? Prior to its enactment the only protection to consumers as to rates and service was their right to make the best contract they could with utilities in competition with each other for their business. This law was the result of growing feeling that such competition, as existed in this field, was inadequate to protect the public. It provided, in lieu of competition and the right of private bargaining, impartial treatment of everyone under regulations approved and enforced by the State. In determining the scope and purpose of the law this court said that the Public Service Commission Act, by use of the police power of the State, intended ''to provide a speedy and sensible scheme for settling controversies so prevalent, so obstinate, so old, so raw and inflamed between public utility companies and their patrons.'' [State ex rel. City of Sedalia v. Public Service Comm., 275 Mo. 201, 204 S. W. 497; State ex rel. Missouri Southern Railroad Co. v. Public Service Comm., 259 Mo. 704, 168 S. W. 1156.] This court also said that the Public Service Law recognized ''certain generally accepted economic principles and conditions, to-wit, that a public utility . . . is in its nature a monopoly; that competition is inadequate to protect the public, and, if it exists, is likely to become an economic waste; that State regulation takes the place of and stands for competition; that such regulation, to command respect from patron or utility owner, must be in the name of the overlord, the State, and to be effective must possess the power of intelligent visitation and the plenary supervision of every business feature to be finally (however invisibly) reflected in rates and quality of service.'' [State ex rel. City of Sedalia v. Public Service Commission, supra; State ex inf. Barker v. Kansas City Gas Co., 254 Mo. 515, 163 S. W. 854.] Contracts cannot limit this regulation because our Constitution specifically provides: ''The police power of the State shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the State.'' [Sec. 5, Art. XII.] Therefore, ''the power of the Public Service Commission . . . overrides all contracts, privileges, franchises, charters or city ordinances.'' [State ex rel. City of Kirkwood v. Public Service Comm., 330 Mo. 507, 50 S. W. (2d) 114; see, also, State ex rel. City of Sedalia v. Public Service Comm., 275 Mo. 201, 204 S. W. 497; City of Cape Girardeau v. St. L.-S. F. Railroad Co., 305 Mo. 590, 267 S. W. 601; State ex rel. Washington University v. Public Service Comm., 308 Mo. 328, 272 S. W. 971; Kansas City Power & Light Co. v. Midland Realty Co., 338 Mo. 1141, 93 S. W. (2d) 954; Midland Realty Co. v. Kansas City Power & Light Co., 57 Sup. Ct. 345, 81 L. Ed. 290; see, also, 3 Pond's Public Utilities, chap. 32, secs. 900-913.] Regulation of rates certainly could not be successful without regulating all rates, and in the Wash-

ington University case, this court said "that contract prices count for naught in the fixing of rates."

The United States Supreme Court, in the recent Gold Clause cases, clearly stated the reasons for the application of this principle, saying:

"Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them. . . . If shippers and carriers stipulate for specified rates, although the rates may be lawful when the contracts are made, if Congress through the Interstate Commerce Commission exercises its authority and prescribes different rates, the latter control and override in consistent stipulations in contracts previously made. . . . To subordinate the exercise of the Federal authority to the continuing operation of previous contracts would be to place to this extent the regulation of interstate commerce in the hands of private individuals and to withdraw from the control of the Congress so much of the field as they might choose by 'prophetic discernment' to bring within the range of their agreements." [Norman v. B. & O. Railroad Co., 294 U. S. 240, 55 Sup. Ct. 407, 79 L. Ed. 885.]

Such "prophetic discernment" in this case, considering the terms of these contracts and leases and their extension provisions, would, if given validity, have the effect of withdrawing these transactions of the utilities and consumers involved from all regulation by the Public Service Commission for half a century. Since the Public Service Commission is not a court, it can neither enforce, construe nor annul contracts, but it "deals with public utilities upon the theory of public service, without regard to any contracts." [Kansas City Power & Light Co. v. Midland Realty Co., supra.] Contract provisions are wholly immaterial where it has authority to act. If it was limited by contracts about matters it is authorized to regulate, the certain result would be inequality between consumers. If all consumers similarly situated are to be treated alike, a contract dealing with one on a different basis from others cannot be recognized. If one consumer by reason of a contract pays less for or gets more service for his money than others, he pays less than it is worth (because the commission is directed to fix just and reasonable rates) and others would have to pay more than their service is worth in order to make up the difference it would cost the utility to give the one consumer special treatment. [See State ex rel. Empire District Electric Co. v. Public Service Comm., 339 Mo. 1188, 100 S. W. (2d) 509; see, also, 1 Pond's Public Utilities, chap. 13, secs. 270-295.] The purpose of providing public utility regulation was to secure equality in service and in rates for all who needed or desired these services and who were similarly situated. Of course, this required classification for rates and service on the basis of location, amount used, and other reasonable considerations, but this does not give

public utilities and their customers the right to fix their own classifications by contract without regard to the rest of the public. Likewise, any such classifications they did make before the act was passed, when they had the right to do so, was subject to reclassification by the commission. Thus it is settled beyond question that the provisions of the contract involved here, as to rates and service, could not stand against any action by the commission in conflict therewith.

This brings up this further question: Were public utilities which had fixed rates and classifications of service with consumers prior to the act required to thereafter obtain approval of and authority to continue rates and classifications then in effect? We think that affirmative action for this purpose was intended; that it made no difference whether such rates had previously been fixed by contract or otherwise; and that not only were prior agreements as to rates and service subject to reclassification and change, but that it was clearly the intention of the act that they should be reclassified (or the commission's approval of the existing rates and classifications obtained) within a reasonable time after it became effective. Otherwise, how could equality in rates and service be established? Could it have been intended that every individual consumer's private arrangements with any utility should remain as it was until the commission discovered it by investigation and specifically ordered that it be abandoned?

Section 5189, Revised Statutes 1929, provides concerning electrical corporations as follows:

"1. . . . *Every electrical corporation,* . . . *shall* furnish and *provide such service* instrumentalities and facilities *as shall be* safe and *adequate.* . . . *All charges* made or demanded . . . *shall be just and reasonable and not more than allowed by law or by order or decision of the Commission.* . . . *Every* . . . *charge* . . . *in excess of that allowed by law or by order or decision of the commission is prohibited.*

"2. *No* . . . *electrical corporation* . . . *shall* directly or indirectly by any special rate, rebate, drawback or other device or methods, charge, demand, collect or *receive from any person* or corporation *a greater or less compensation* for gas, electricity . . . or *for any service rendered* or to be rendered in connection therewith, . . . *than it* charges, demands, collects or *receives from any other person* or corporation for doing a like and contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions.

"3. *No* . . . *electrical corporation,* . . . *shall* make or grant any undue or *unreasonable preference or advantage to any person,* corporation or locality, *or to any particular description of service* in any respect whatsoever." (As to heating companies see Section 5228, R. S. 1929.)

Some of the commission's powers to determine these matters and enforce its findings stated in Section 5190, Revised Statutes 1929, are as follows:

"1. Have general supervision of all . . . electrical corporations. . . .

"2. . . . Have power to order such reasonable improvements as will best promote the public interest, . . . and protect those using . . . electricity . . . and have power to order reasonable improvements and extensions of the works, wires, poles, pipes, lines, conduits, ducts and other reasonable devices.

"12. Have power *to require every* . . . *electrical corporation,* . . . *to file with the commission* and to print and keep open to public inspection schedules showing *all rates and charges made,* established or enforced or to be charged or enforced, *all forms of contract or agreement* and all rules and regulations relating to rates, charges or service used or to be used, *and all general privileges and facilities granted or allowed.* . . . *No corporation* . . . shall charge, demand, collect or receive a *greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable* to such services as specified *in its schedule filed* and in effect at the time; . . . *nor to extend to any person* or corporation *any form of contract or agreement . . . or any privilege or facility, except such as are regularly and uniformly extended to all* persons and corporations under like circumstances." (All italics ours.)

(Sec. 5249.) "The commission shall ascertain, determine and fix for each kind of public utility suitable and convenient standard commercial units of service, product or commodity."

These provisions mean that a public utility may by filing schedules suggest to the commission rates and classifications which it believes are just and reasonable, and if the commission accepts them they are authorized rates, but the commission alone can determine that question and make them a lawful charge. ■ The first Public Service Commission construed the act as requiring its affirmative approval of all rates, because it did make an order requiring "every electrical corporation . . . not later than October 15, 1913, to have on file . . . schedule of all rates, rentals and charges of whatever nature made by such . . . corporation . . . for each and every kind of service which it renders as were in force on April 15, 1913, together with proper supplements covering all changes." Cupples' schedule filed pursuant to this order set out "a combined light and power rate consisting of a service charge of $3.50 per month per K.W. demand, plus and energy charge of 2 cents per K.W. for all current used." It also stated that "in addition to the present schedules, we have a number of contracts at varying rates made

prior to April 15, 1913, the rates in some cases being a part of the leases of the premises, said leases having in some instances years to run.'' Certainly merely making such general statement about contracts in a schedule, without showing service furnished or rates charged, could not reasonably be construed as an authorization to continue all their provisions or to make them prevail over applicable scheduled and authorized rates. Moreover, later Cupples' schedules filed in 1917 and 1918, canceling and replacing this original schedule, did not in any way mention these contracts. Union also filed its rates pursuant to this original order and has filed new schedules both before and since it acquired Cupples' stock in 1923. While the further question must be determined, as to whether May is actually doing business with and receiving service from Cupples or from Union, in order to determine whether Cupples or Union rates now apply, clearly one or the other must apply rather than any private contract rate never filed with or disclosed to the commission. This view has very recently been sustained by the United States Supreme Court, in affirming the Midland Realty Company case supra, in which it said: ''The rates . . . filed . . . and . . . promulgated by the commission in accordance with the statute have the same force and effect as if directly prescribed by the Legislature,'' and it could not reasonably be contended ''that immediate exertion by the Legislature of the State's power to enforce reasonable and nondiscriminatory rates depends upon or is conditioned by specific adjudication in respect to existing contract rates.''

In order to determine whether there are applicable scheduled rates, it is necessary to decide whether charges are to be figured from Cupples' schedules or Union schedules. If it be Cupples' schedules, plaintiff could recover nothing, because the last Cupples' schedules were filed in 1918 (amended in 1920), and provide higher rates than plaintiff paid. The status of Cupples since Union acquired its stock in 1923 is the decisive question. On this issue, we adopt the following facts, without use of quotation marks, which were stated in referee's report:

The first physical act of change was the removal of the office and records of Cupples from its old quarters in the Railway Exchange Building to the building of Union on Twelfth Street. A general engineering conference was held, as a result of which there was a comprehensive interconnection made of Union and Cupples overhead lines. These various cut ins enabled Union to serve customers of Cupples, and did away with the necessity, from a broad operating standpoint, of the two companies maintaining wasteful duplicate facilities. When these cutins were made, Cupples' plants were synchronized with those of Union. The various Cupples' plants, instead of being unified together and having no connection with Union,

were thereafter able to operate as a system only in conjunction with Union. (All Cupples' plants were dismantled except the Railway plant and the Cupples Station plant.) The contract with the Phoenix Company appears to have been terminated at the end of June, 1923. Many of Cupples' overhead lines were dismantled or abandoned; the remainder were connected with the system of Union. The electric customers of Cupples were begun to be switched or transferred over to the Union. This process of transfer appears to have been steadily carried on until all Cupples customers not under special contracts were made Union customers. The reason for these transfers were the estimated greater profit to Union under its own rates.

The president, vice-president, secretary and treasurer of Union were respectively elected to the corresponding offices in Cupples and have held such corresponding offices ever since. The first three compose the directorate of Cupples. As officers of both companies, they occupy the same general office quarters, which belong to the Union, and for which no rental is charged to or paid by Cupples. The manager of Union's steam service department was appointed manager of Cupples, and as such, took charge of all of Cupples' steam and electric service plants, and has ever since remained in charge. None of the officers of Cupples received any compensation as officers or employees of Cupples. Their salaries are paid to them by Union. About the end of August, 1926, Cupples established a so-called pay roll bank account which it operated as follows: Twice a month Union draws a check equal to the pay roll records of Cupples. This check is deposited in its pay roll bank account by Cupples and its pay roll checks drawn against it. (Since 1924 there have usually been less than twenty Cupples employees in all plants.) Expense accounts are paid by Union and credited and charged in the intercompany accounts. Union keeps for itself all cash discounts on purchases made for Cupples, charging to the latter company the full price. Union pays the rental on the premises occupied by the Railway Exchange plant as reserved in the leases therefor, charging and crediting such payments in the intercompany accounts. All bills for services rendered by (or in behalf of) Cupples to its customers (including May and Railway) have at all times been made out and are now being made out in the name of Cupples. All checks received in payment of such bills have been made out to Cupples and these checks, as well as all other checks issued to Cupples (except for a short period), have been and are still being indorsed over to the Union by common officers of the two companies, deposited in Union's bank account, credited to Cupples and charged to Union on the intercompany accounts.

Early in 1924, Union required another substation to serve direct current to its downtown customers, and after looking about for a

suitable downtown location, Union installed a substation in a space approximately thirty-six feet by thirty-two feet in the Railway plant. A rental for this space was charged to the Union in the intercompany accounts, but there appears to have been no written or, indeed, any very definite arrangement. This substation consisted of one 5000 horse-power motor and two connected 1,875 K. W. direct current generators with other accessory equipment. This unit was to be and has been supplied with alternating current from the Union's high voltage system. It had a capacity approximately four times greater than the Cupples equipment that was devoted to the generation of direct current. The substation installed by Union receives 13,000 volts alternating current from the high voltage system of the Union Company, which it converts into 230 or 240 volts direct current. Upon installation and completion of the substation there were extensive cut ins and connections of Union cables in and with the Cupples underground system. The general effect was to unify the Cupples underground system with that of Union so that they could be operated as one. Apart from cut ins and connections, in some instances the Cupples cables were entirely removed, which had the effect of rendering impossible the further service of certain of its old customers by Cupples and direct Union connections were made.

Prior to the installation of the substation two 4,000 volt cables, from Union's Ashley street plant, carrying alternating current, were brought into the Railway plant and connections made with Cupples converters and transformers. When the generators in the Railway plant were used, part of the current received by May came from the plant, and part from Ashley Street. The same was true of direct current. The alternating current delivered from these Ashley Street cables was measured by Union meters before passing into Cupples machines. The greater part of the direct current production by Union's substation in the plant passed into and reinforced the downtown Edison network of Union. Since the completion of the substation, most of the direct current for May and Railway has been obtained from Union rather than from operation of the plant converters. In addition, probably in the fall of 1924, a steam pipe connection from the Ashley plant of Union was laid into the Railway plant. After the installation of the substation, the use of the direct current generators in the plant was discontinued. In 1925-1926 and 1927 there was practically no generation from any source at the Railway plant. Whatever steam was used by this plant or sold by this plant during these years was obtained from the Union Company. Substantially all the electric power delivered to May or Railway was purchased from Union. In the years 1928, 1929 and 1930 there was generated in the Railway plant about 900,000 kilowatt hours per year, which was manifestly generated as a matter of economical

administration in order to get work out of high pressure steam bought from Union, which had to be reduced to low pressure steam for use by May and Railway. There was practically no operation of the Railway plant boilers in 1927 after May 18th; no operation of the boilers in 1928, and practically no operation of the boilers in 1929. In 1930, the operation equaled one boiler for a period of thirty-three ten-hour days. At all times the boilers were kept in good condition ready to operate.

The Cupples Station plant, after the completion of the substation, had its switchboard torn out and a new panel put in whereby the plant could receive current from Union Company or could (and did to a considerable extent) generate current and project it into Union Company's system. A Union cable was run into Cupples Station. In 1928, 1929, 1930 and 1931 most or nearly all of the current generated at the Cupples Station plant must have been for the sake of getting low pressure steam. The electric current generated at Cupples Station plant went into the Union system, and the service to Washington University at Cupples Station plant came from the Union system. All current and steam furnished to Cupples by Union has been metered and charged to Cupples in the intercompany accounts, and vice versa as to current and steam furnished by Cupples to Union. As a final result of the changes, Cupples could not serve its old outside customers save in conjunction with Union. At the close of the year 1930, the Railway plant had only three customers, to-wit: May and Railway under the service contracts, and the Dolph Building on Locust Street under the tariff filed. The Dolph Building, which was controlled by May, was not switched for fear of bringing about a possible demand by May for direct service by Union instead of under the service contract. So far as the Cupples Station plant was concerned, by 1930, Washington University, pursuant to its requirements under its lease contract, was the sole electric customer supplied by the Cupples Station plant. In 1930 Cupples Station steam customers numbered fourteen, and no steam has ever been brought by Union into the Cupples Station plant. At no time since the acquisition of its stock by Union has Cupples ever solicited any new electric customers for any of its plants.

Cupples has retained its corporate charter. It has held annual stockholders' meetings and elected directors as provided in its by-laws and articles of association. Regular directors' meetings have been held and minutes preserved of all stockholders' and directors' meetings. Annual reports and anti-trust affidavits of Cupples have been regularly made to the Secretary of State of Missouri, and regular annual reports of Cupples have also been made to the Missouri Tax Commission as required by law. The corporation franchise tax of Cupples has been regularly paid by Union and charged to Cup-

ples in the intercompany accounts. The annual reports of Cupples required to be filed with the Missouri Public Service Commission have been made and filed. Reports by Cupples have been made to the State of Missouri and to the United States, under State and Federal Income Tax laws and the taxes assessed thereon have been paid by Union and charged to Cupples in the intercompany accounts. Returns of Cupples' taxable property have been regularly made in the name of Cupples to the proper tax authorities in Missouri by common employees of Union and Cupples, acting for Cupples in the making of such returns; and such state, city and school taxes as have been assessed thereon against Cupples have been paid by Union and charged to Cupples. Insurance policies on property and boiler insurance policies have been issued from time to time to Cupples and premiums thereon paid by Union and charged to Cupples. Ever since the Missouri Workmen's Compensation Law has been in effect, insurance has been carried by policies issued to Cupples covering the risk under such law. Since June, 1925, there have been monthly credits in the intercompany accounts to Cupples and corresponding charges to Union of $4350.08, based upon vouchers for rental of property of Cupples (poles and fixtures, overhead and underground distribution system, etc.) used by and chargeable to Union at $52,237 per annum. (Without this rental Cupples would have shown a loss instead of a net profit for every year.)

The referee's conclusion was that after the completion of the substation in the Railway plant in July, 1924, "Cupples was instrumentalized and that from such date the corporate entity of Cupples ought to be disregarded." The chancellor found that "Cupples maintained its corporate entity and performed its corporate duties in a manner sufficiently independent of Union to entitle it to be treated as a public utility (corporation)."

█ What are the tests to be applied to determine whether the acts of one company can be charged to another? Defendants cite the criticism of the use of such terms as "instrumentality," as furnishing no real basis for decision, made by Professor Latty in his recent instructive book on "Subsidiaries and Affiliated Corporations." Cases in this field can hardly be reconciled. In Berky v. Third Avenue Ry. Co. (N. Y.), 155 N. E. 58, a leading case holding against liability for acts of a subsidiary company, Justice CARDOZO said:

"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized

as an 'alias' or a 'dummy.' All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted *to the tests of honesty and justice*." (Our italics.)

Justice CRANE, dissenting in that case, because he thought the holding corporation should have been held liable for the tort of its subsidiary, said that "other cases, nowhere near as strong in their facts of dominance as in this case, have held the controlling company liable." Justice CRANE's statement is correct, but the review of cases made by Professor Latty shows that neither ownership, dominance, nor control can be made the sole criterion; that many cases do, as Justice CARDOZO noted, make an epithet the basis of decision; and also that to attempt solution by the rules of agency usually results in introducing more complications than are avoided. Professor Latty says:

"So long as the technique resorted to, when recovery is denied, is to assert that a corporation is something separate and distinct from the stockholder, and where recovery is allowed, to assert that the corporation is not separate and distinct when it is so controlled and dominated as to be a mere instrumentality, we may continue to expect confusion. [p. 220.] . . . No help is to be derived from the multitude of meaningless, though undeniably picturesque, epithets which have been applied to corporations whenever the court has felt, often inarticulately, that the corporate device was being *used in ways or circumstances which the court did not sanction*. Whatever failure there has been in recognizing the specific issue presented in various types of cases involving parent and subsidiary corporation or in giving expression to the real factors which made the court do what it did, there has been no lack of emotive epithets synonymous with and as empty as 'instrumentality:' adjunct, agent, *alter ego, alter idem,* arm, blind, branch, buffer, cloak, coat, corporate double, cover, creature, curious reminiscence, delusion, department, dry shell, dummy, fiction, form, formality, mere name, mouthpiece, mere phrase, puppet, screen, sham, snare, subterfuge, tool." [pp. 157-158.] (Our italics.)

Instrumentality is perhaps the term most frequently used. Since all corporations are in one sense instrumentalities of their stockholders, it does not state the true "*ratio decidendi*" to say that liability is imposed because a corporation is an instrumentality of its owner (corporate or individual) any more than to designate the arrangement as "hooey" or "horsefeathers." Professor Latty argues for the need of formulating real tests and suggests "determination

of problems of intercorporate liability in terms of economic unity, of voluntary or involuntary creditors, and of solvency or insolvency of the corporation against which the claim primarily lies." (p. 220.) Since defendants rely on Professor Latty's criticisms, we will determine what result would be reached by his tests. Completeness of ownership and control are elements to be considered in determining when there is economic unity. Professor Latty says:

"The entire economic enterprise into which the legal units are constituted, as a possible limit within which one corporation is liable to certain creditors of another corporation, is suggested by the results of the decided cases. The cases that have arisen, whether they imposed liability or, because of the type of creditor, denied liability, have generally involved corporations whose functions were similar or supplemented each other. . . . The difficulty is that the economists themselves have no formulation of what constitutes a single business unit. And even if they did, *what is a single enterprise for one purpose would not necessarily be so for another*, and the formulation would have to be one, so far as our problem is concerned, for the purpose of allocating losses. [p. 213.] . . . The criticism heretofore in this work directed at control as the test of liability was based on the impossibility of distinguishing the cases which imposed liability from those which denied liability by simply trying to determine whether the parent controlled too much or too directly. [p. 217.] . . . Given substantial identity of ownership and the unified administrative control (which follows almost automatically from such ownership, the constituent companies may be considered a single economic enterprise even if their business functions differ considerably. Of course, if their activities are similar (e. g., separately incorporated chain stores), or supplement each other (i. e., sales corporation which purchases and resells the output of its affiliated manufacturing corporation), the case is so much the stronger. . . . The evidence that the economic fact of business unity is shaping judicial decisions in inter-corporate vicarious liability is convincing." [p. 219.] (Our italics.)

It would seem that the situation before us is a complete case of economic unity. Union's business is producing and selling electricity and steam. Cupples' only electrical customers are those with whom it had old contracts which provided more profitable rates than the commission now permits Union to charge. (The only exception was the Dolph Building, owned by plaintiff, for the reason noted.) Cupples' steam customers, served from Cupples Station plant, were those who could be served with steam produced there but first used there to generate electricity for the Union system. Steam customers at the Railway plant, who were the same as its electrical customers, got steam from the Union system which was made to generate in the

Railway plant part of the electricity furnished them before it reached their heating system. Cupples thus supplemented Union both in production and sales of steam and electricity. So far as ownership and control is concerned, it is apparent here that Union had complete ownership of Cupples (the commission authorized it to be its sole stockholder), and that it had and exercised (through its chief officers being Cupples' chief officers and only directors) complete control of Cupples. Referring to an ancient but well known Biblical incident, we could say that *the hand* (held out to receive pay) *was the hand of Cupples, but the voice* (giving orders for operations and saying what would be done with the money) *was the voice of Union.*

Professor Latty's other suggested tests for determining when intercorporate liability should be imposed also fit this case. It seems clear that plaintiff should be classed as an involuntary creditor, if we decide there is anything due to it from Union, on the theory that it paid an unlawful rate which it had to pay to insure uninterrupted service essential to continuing its business. Since July, 1929, it has paid the rate charged under protest. Concerning the matter of solvency, it appears that Cupples' solvency depends on Union because, except for the arbitrary amount paid by Union for rental of its distribution lines, Cupples would lose money every year and necessarily (considered either by rules of law or arithmetic) insolvency would be the ultimate result. Moreover, Union does not allow Cupples to own any money it receives. It puts all Cupples' collections in the Union bank account, pays its bills for it as they come due, and hands out to it twice a month the amount necessary to pay the employees who work in its two plants. A guardian, appointed by the probate court, could not do more for this ward. (Quaere: Would Cupples have been kept alive if the service contracts had expired?)

Perhaps broader phases of the matter of limitations upon limited liability of corporate stockholders in other corporations should always be a legislative rather than a judicial question. It does seem, however, that the determination of whether there is a case for equitable relief could and should be decided by the test of whether or not the arrangement involved is being used for a proper purpose. Should not all these other suggested tests be used only as aids for determining the true purpose of the arrangement? Making a corporation a supplemental part of an economic unit and operating it without sufficient funds to meet obligations to those who must deal with it would be circumstantial evidence tending to show either an improper purpose or reckless disregard of the rights of others. Equity sets aside legally sufficient conveyances if their purpose is to defraud creditors. If any intercorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, certainly equity does have the authority to tear down technical

legal barriers and reach beyond them to impose liability or grant proper relief. If the purpose is lawful, and fair and equitable to those with whom it is intended to deal, legal forms and relationships should be observed. Men have the right to use legal forms which they believe to be helpful in accomplishing proper purposes. The question should not be merely "instrumentality," but "instrumentality for what purpose." Cases in many fields of the law turn on intent or purpose. "Things do not have to be in broad contrast to have different practical and legal consequences. Actions take estimation from degrees, and of this life and law are replete with examples." [Industrial Accident Commission v. Davis, 259 U. S. 182, 42 Sup. Ct. 489, 66 L. Ed. 888.]

█ Cupples' corporate equity was, unquestionably, kept in existence to be used for the purpose of carrying on a part of Union's electric and steam business. We think the decisive questions here are: What part and for what purpose? The answers to these questions plainly are: The part which was covered by contracts which could not be enforced if they were assigned to Union; For the purpose of collecting rates fixed by those contracts, which the commission does not allow Union to charge for the service rendered. We hold that this is a clear case of electricity and steam being produced and sold by Union, but being collected for at rates Union is not authorized to charge, through preserving the corporate entity of Cupples. A finding of such a purpose (none other appearing from any reasonable construction of the evidence) seems to be the correct conclusion. We further hold that this purpose is not proper or lawful, because evasion of the law for uniform regulation of public utility rates will not be permitted by such a device; and that, if Union has in this manner obtained more money from plaintiff than its own authorized rates would be for the service rendered, it must pay back this excess. This holding is supported by both reason and by precedent. The United States Supreme Court has held in similar situations that rate regulation cannot be evaded or preferences granted by use of subsidiary corporations. [Chicago, Minneapolis & St. Paul Railroad Co. v. Minneapolis Civic Assn., 247 U. S. 490, 38 Sup. Ct. 553, 62 L. Ed 1229; United States v. Delaware, L. & W. Railroad Co., 238 U. S. 516, 35 Sup. Ct. 873, 59 L. Ed. 1438; Southern Pacific Co. v. Interstate Commerce Comm., 219 U. S. 433, 31 Sup. Ct. 288, 55 L. Ed. 283; United States v. Reading Co., 253 U. S. 26, 40 Sup. Ct. 425, 64 L. Ed. 760; also Id., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243.]

█ Did plaintiff pay too much if the charges for service rendered to it are figured at authorized Union rates? It is contended that Union does not have and has never had scheduled rates applicable to the class of service contracted for by and rendered to plaintiff.

It is said that because the contract rate was the only rate which covered this service, plaintiff must pay it. That argument cannot help Union collect the contract rate, because the commission has never authorized it to charge the contract rate. Neither Cupples nor Union ever asked that the contract rate be authorized for any class of service, and it was their duty (and has been at least ever since the first order of the commission requiring schedules to be filled) to obtain authorization by filing schedules for every rate charged for every class of service. Failure to comply with the law could not authorize Union to collect an unauthorized rate. However, we agree with the referee's finding that scheduled Union rates will cover the service rendered. It is true that Union does not have one combined rate covering steam, electric light and power service, but Union has rates for steam and the charge for steam furnished can be computed at its steam rates; Union also has rates which cover electricity furnished for all purposes and the proper charge for electricity can be computed at these rates. Then in order to find what plaintiff should have paid for what it got, it is only necessary to add these amounts.

But Union says that is not all plaintiff contracted for nor all it received; but that it also got an inspection service and a standby service. Concerning the inspection service (this was to inspect plaintiff's conduits, wires and pipes without charge) if the commission has authorized a rate for it, this charge should be made and added to the other charges; if it is a service for which rates are not fixed by the commission because not properly a part of public utility service (for example: Ordinarily done by plumbers or electricians) it may be charged for at what it is reasonably worth if it is not included in existing rates. The claim that standby plant maintenance or breakdown service was rendered is based on the contract provisions requiring construction and operation of the Railway plant and maintenance of adequate continuous service from that plant. Plaintiff says that the Railway plant was maintained as a standby for Union but nevertheless claims that the contract required that all its steam and electricity be produced at the Railway plant.

The referee stated Union's position thus: "If we were to furnish steam and electricity under our tariffs, we would not maintain a special plant in the vicinity. We would simply run in our wires and pipes. For a number of years, supposing we had a contract which required the maintenance of the plant, we kept boilers, generators and expensive machinery ready to serve, as against any possible contingency. We have spent a good deal of money doing this. . . . We ought to have some allowance or compensation for this extra service—the maintenance of these standby or service facilities, which were not covered by our tariff, and were never intended to be covered thereby." The referee made an allowance in favor of defendants

by way of recoupment to reduce the amount of its liability to plaintiff for overcharge on the quasi contract theory that "if a contract be regarded as void (but not in the technical sense illegal), a person who has undertaken to perform in reliance upon the void covenant of his adversary, may recover reasonable compensation."

The referee allowed an offset of $65,435.82 to defendants for such maintenance cost from 1925 to 1929, on the theory that defendant was entitled to rely on the contract up to the disagreement in July, 1929. There would be no difficulty in sustaining this view if this situation arose between two parties in whose dealings with each other the public had no interest. But the Public Service Commission Act is a declaration of the public interest in every utility service furnished and every rate charged. Since the purpose of public utility rate regulation is to provide uniform adequate service at uniform rates, an unreasonable preference or advantage in kind of service is as specifically prohibited as a preference in rates. It does not seem reasonable that an electrical company could maintain and operate a separate plant, sufficient in any event to supply all requirements, across the street from every large consumer (or even each group of consumers using in the aggregate as much steam and electricity as May and Railway) and still charge everyone reasonable rates. Someone would have to pay sometime for such an unnecessary and wasteful system. If it cannot be furnished to others under like circumstances, it is preferential and discriminatory to do so for plaintiff. In 1912, separate plants for large consumers, although expensive, may have been necessary to insure adequate service. Progress through invention and increasing efficiency in organization has made such an arrangement archaic, and, by development of improved central systems, rates have been lowered so that electric service is available to and considered a necessity by almost everyone. This is one of the many factors through which large scale mass production has created the remarkably increased comforts and living standards of modern America. No one can read this record without believing as the referee found, that service from the present Union system is much safer and surer than the original Cupples service, and that plaintiff never before had "such multiple and safeguarded sources of supply." (He also found that no other consumer was as favorably situated.) The act gives the commission power to authorize abandonment of unnecessary equipment or facilities or to require reasonable improvements. Surely an electrical company, which must have authorization from the commission for every rate it charges for every kind of public utility service is furnishes, has no right under the law to furnish preferential service of such an unnecessary, wasteful and expensive character without the commission's approval, especially as to the rate to be paid therefor. The act requires that

*adequate* service be furnished to all at authorized rates. Union could not by contract obtain the right to collect more than authorized rates for *adequate* service (whatever plant such service required); and likewise, plaintiff could not by contract get any rights to special and preferential treatment. If plaintiff was not getting *adequate* service the place to go for relief was the Public Service Commission; and if defendant needed higher rates in order to provide *adequate* service the commission could have authorized them.

Union further contends that there can be no jurisdiction for a court of equity to determine this case because May could have obtained complete relief by making application to the Public Service Commission. To recapitulate and attempt to clarify our rulings herein above made, we state our conclusions concerning the jurisdiction of the commission and the courts, as follows:

First: The Public Service Commission has exclusive jurisdiction to establish public utility rates and may do so either by approval of rate schedules filed with it or by order after investigation or hearing. Courts do not have jurisdiction to determine what rates shall be paid for any public utility service.

Second: A public utility has no right to fix its own rates or to agree upon rates with its customers and cannot charge and collect rates that have not been established by the Public Service Commission. As its authority for every rate for every kind of service it desired to furnish, it must show approval by the commission.

Third: It is the public utility and not the customer that must in the first instance take affirmative action to have a rate established by the Public Service Commission and it should do so before beginning to furnish the service involved. (Acceptance of schedules may show approval.)

Fourth: Rates established by the Public Service Commission supersede all prior contracts or agreements as to rates, without specific adjudication by the commission upon any contract.

Fifth: Rates in effect by agreement or otherwise, before the Public Service Commission Act, had to be established within a reasonable time thereafter by receiving the approval of the commission before their continuance was authorized.

Sixth: Although the Public Service Commission has exclusive jurisdiction to establish rates to be charged from and after the time of their promulgation, it does not have authority to hear an action by a public utility customer for an accounting for past overcharges in excess of rates established by it for the purpose of recovering such excess from the public utility. The commission is not a court and cannot enter a money judgment for one party against another.

Seventh: The Public Service Commission has full authority to investigate complaints about rates or service and can make orders

to remedy the situation for the future, but it cannot grant monetary relief for compensation for past overcharges or damages.

Eighth: If a public utility has failed to collect the full amount of the rate established by the commission for the service rendered, it may recover the deficiency by appropriate action in the courts upon proof of a lawfully established rate applicable to such service and proof that it has not been collected in full.

Ninth: If a public utility has collected more from anyone than the full amount of the rate established by the commission for the service rendered, such customer may recover the excess by appropriate action in the courts upon proof of a lawfully established rate applicable to such service and proof that more has been collected.

Tenth: Although the commission had by order authorized the continuance of Cupples as a separate public utility, the basis of recovery against Union herein is that Cupples was not in fact continued *as such;* but it was continued only for the purpose of charging rates, fixed by old contracts, which had never been established by the commission and were higher than the rates the commission had established for the service rendered. Because Cupples was not actually continued as a separate public utility, a court of equity could hold that the service furnished to May was *in fact* Union service.

Eleventh: The reason Union cannot be allowed anything for maintaining a standby plant, is that the law required it to furnish adequate service. If a standby plant was not necessary to furnish adequate service, because of its other facilities then Union's remedy was to obtain the authorization of the Public Service Commission to abandon it. If a standby plant was necessary to furnish adequate service, then Union's remedy was to obtain the authorization of the commission to charge higher rates if they were necessary to take care of such expense.

However, our conclusion is that plaintiff cannot recover anything on rates applicable prior to July, 1929. The referee made plaintiff an allowance for overcharge from and after May 1, 1925, on the basis of Union's *standard contract rate* for the light and power thereafter furnished. This *standard contract rate* was applicable to "consumers signing the company's standard form of contract providing service for one year or more." Such a contract was authorized by the commission, but prior to July, 1929, plaintiff did not sign or ask to sign such a contract or make demand for any Union rates. The record discloses no dispute and no demand for a different rate until in July, 1929, after controversy had arisen over fixing of a rate by the original contract method for the next five year period. The *standard rate* involves measurement or assessment of demand as a factor as well as measurement of consumption. "Demand is defined as the greatest rate at which electrical energy is used by the cus-

tomer within any period of fifteen consecutive minutes during the contract year." If plaintiff is not entitled to the *standard rate,* then the Union rate applicable to its service would be the *increment rate* based solely on actual consumption. From the testimony and the referee's findings it appears that if this *increment rate* is applied to the actual consumption of electrical current by plaintiff (1924-1929) and the amount necessary to pay for steam (1924-1929) at Union's authorized steam schedules is added, then the total that plaintiff would have been required to pay under these rates is as great as plaintiff did pay under old contract rates as fixed for that period. Therefore, plaintiff was not overcharged during that time if the *increment rate* is applicable.

The referee's view was that plaintiff undoubtedly would have signed a standard form contract "if it had been advised of the facts" and that "the maxim that equity regards that as done which ought to have been done might well be applied." We think this rule should be applied after July, 1929, when plaintiff refused to agree to pay a rate fixed under the contract method, demanded that Union's rates be charged for its service, was willing to do what was necessary to get the best applicable scheduled rates and made its subsequent payments under protest. Union then refused the application of any of its scheduled rates. However, prior to that time, plaintiff seems not only to have been satisfied with the rate charged and service furnished in accordance with the old contract provisions, but was insisting on full performance of that contract and was unwilling to accept service on any other basis. (Railway still insists on service from the Railway plant under the old contract.) It is the rule that estoppel cannot be invoked to prevent recovery of unlawful overcharges. [Mellon v. Stockton & Lampkin, 326 Mo. 129, 30 S. W. (2d) 974, and cases cited.] However, there is considerable difference between estoppel to complain of collection of an unlawful rate, and estoppel against or waiver of the right to assert that one lawful rate shall apply rather than another lawful rate. Surely a customer who refused to make an advance contract would not be allowed to wait to see which rate would be most favorable and then claim the best rate. Did not plaintiff by insisting on the old contract provisions in effect refuse to make the standard contract? Under these circumstances, we are not impressed that the equities of this situation require that plaintiff be given the benefit of the standard contract rate prior to July, 1929. Under these circumstances, where there were two lawful applicable rates and compliance with certain conditions was required in advance to get the one (which it turns out afterwards would have been most favorable), we hold that plaintiff was not entitled to have the *standard* form advance contract rate applied after the service was rendered, whether the matter be con-

sidered on the basis of estoppel to now claim that rate or of conceded failure to attempt to comply in advance with the necessary conditions, approved by the commission, for obtaining the standard contract rate.

[12] We hold that, while plaintiff has the right to an accounting on a basis of Union scheduled rates prior to July, 1929, if plaintiff desires to refigure charges for electricity on scheduled rates prior to that time, it has no right during that period to claim the benefit of the standard contract rate. The view we take makes it unnecessary to consider the questions passed on by the referee and raised here as to duress, concealment of facts concerning changes in the plant, and Statute of Limitations. We hold that after the expiration in July, 1929, of the last five-year period of the agreed contract rate, and from the time plaintiff demanded the right to Union scheduled rates and was ready and willing to execute a *standard* form contract (which we find was in July, 1929), plaintiff is entitled to have its charges for electricity computed by the *standard* contract rate; that plaintiff is entitled to recover the overcharge thereafter paid by it; and that as to such payments of overcharges, which were thereafter made under protest, plaintiff is entitled to recover interest as fixed by Section 2839, Revised Statutes 1929. [17 C. J. 817, sec. 137; 33 C. J. 212, sec. 73; Arkadelphia Milling Co. v. St. Louis-Southwestern Railroad Co., 249 U. S. 134, 39 Sup. Ct. 237, 63 L. Ed. 517; L. & N. Railroad Co. v. Sloss-Sheffield Steel & Iron Co., 269 U. S. 217, 46 Sup. Ct. 73, 70 L. Ed. 242.]

The judgment is reversed and the cause remanded with directions to proceed with an accounting in accordance with rulings of this opinion. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.