RAILWAY EXCHANGE BUILDING, INC., and MAY DEPARTMENT STORES COMPANY, Appellants, v. THE LIGHT & DEVELOPMENT COMPANY, CUPPLES STATION LIGHT, HEAT & POWER COMPANY and UNION ELECTRIC LIGHT & POWER COMPANY.—107 S. W. (2d) 59.

Division One, June 30, 1937.*

*NOTE: Opinion filed at September Term, 1936, April 21, 1937: motion for rehearing filed; motion overruled at May Term, 1937, June 30, 1937.

*Edward A. Haid, Sullivan, Reeder & Finley* and *Lewis, Rice, Tucker, Allen & Chubb* for appellants.

*McCammon & Sandison, Taylor Sandison* and *John P. McCammon* for respondents.

HYDE, C.—This is an action in equity seeking (on the theory that defendants' lease had been terminated because of default) specific performance of certain provisions in a contract, for sale and conveyance of the electric light, power, and steam plant, which under this contract was to be maintained and operated to supply plaintiffs' needs. Appraisal of the reasonable value of the plant, a mandatory order to compel the removal of certain machinery (owned by Union), as well as an injunction against removal of certain other equipment and machinery therefrom was also sought. It appears that the value of the plant was at least $206,632, and that defendants' valuation is more than double that amount. Judgment was entered dismissing plaintiffs' bill and plaintiffs have appealed therefrom.

Most facts material to the decision of this case may be found in the statement made in May Department Stores Co. v. Union Electric Light & Power Co., 341 Mo. 299, 107 S. W. (2d) 41, decided concurrently herewith. We will refer to the parties herein by the designations therein used. The May case is based on the proposition that the original contracts as to rates and service became void when the Public Service Commission Act went into effect. This case is based upon exactly the opposite theory that the contract is valid and its enforcement is sought. Thus defendants were between two fires. After the May case had been commenced because of the controversy over rates therein described, May wrote to Development and Cupples, on June 30, 1930, notifying them to, within thirty days, put the plant in operation and keep it in continuous operation thereafter, to cancel any subletting to Union, and to disassociate the ownership and operation of the plant from any public utility company; and that failure to do so would be regarded as a forfeiture of their lease of the plant premises from May. Cupples answered this letter stating that it was "not required to put the plant in operation" but only to "keep it in condition ready to operate immediately when necessary." Railway also

wrote both companies that, in case of forfeiture of the lease from May because of failure to comply with the requirements of its letter, it demanded "the right and privilege to purchase said plant at the appraised value thereof" as provided in its service contract. Cupples answered that it denied the right of May to declare a forfeiture. Development did not answer either letter.

The provision of the lease, which May claimed was violated so that forfeiture could be declared was the agreement by the lessee to "install, operate and maintain in said leased space, a new, modern, first-class power, lighting and heating plant of capacity sufficient to supply all of the electric current for light and power and steam for heat and for heating hot water, which may be required by the Railway Exchange Building, and by any of its tenants, in addition to the requirements of all other customers of the Plant Company, said plant to have a sufficient reserve or excess in capacity to provide such reasonable security against suspensions in service as will conform to good engineering practice; and . . . at all times during the life of this lease maintain in said plant premises a plant equipment of the character and capacity above described."

The provision of the contract, upon which Railway claimed the right to purchase the plant and to enforce which this suit is brought, is as follows:

"Upon the termination in any manner of this contract, or upon the termination in any manner of the lease of the plant premises to the Plant Company, or upon the termination in any manner of the lease from the Kingston Investment Company to the May Company covering the premises in which the plant is situated, or upon the termination in any manner of the lease from the Building Company to the May Company covering the store premises in the Railway Exchange Building, then the Building Company shall have and is hereby granted an exclusive option or first right during the period of ninety (90) days thereafter, to purchase the entire plant, tools and equipment, including pipes, tunnels and connecting lines, together with said lease from the May Company to the Plant Company, at a price to be agreed upon by the parties hereto, or upon failure of the parties hereto to agree on the price to be paid, then at the appraised value as fixed by a board of three appraisers."

There was also a provision in the original contract between May, Railway, and Kingston, before the plant premises were built, that "in case the Building Company shall, pursuant to the provisions hereof, purchase said plant from any Plant Company during the life of the Building Company's lease to the May Company, such purchase shall (unless the Building Company has the right to and does pursuant to the provisions hereof, make such purchase for its own sole account) be treated as made for the joint account of itself

340

and the May Company, respectively." It is because of this provision as well as because May was the lessor of the plant premises that May is one of the plaintiffs herein.

█ As we pointed out in the May case, within a year after these leases and contracts were made the Missouri Public Service Commission Law was enacted (Chap. 33, R. S. 1929), and prior to its enactment, the only protection to consumers as to rates and service was their right to make the best contract they could with utilities in competition with each other for their business. Since this law was based upon the police power of the State, the power of the Public Service Commission, established by it, overrides all contracts contrary to its purposes of uniformity. Just as we held the contract did not bind May to pay higher rates than the commission authorized to be collected from all consumers similarly situated for the service authorized to be rendered, so must we also hold that it did not bind the Utility to furnish special preferential service to any consumer. The rights of May and Railway are those fixed by law; that is only to receive the kind of service authorized to be rendered to all consumers similarly situated for the rate authorized to be collected therefor. In other words, a contract provision for a preferential kind of service is just as void (against regulation under the police power of the State to secure uniform, safe and adequate service to all consumers), as a contract provision for a preferential rate. The impossibility of maintaining and operating a complete separate plant, sufficient to supply all requirements, across the street from every large consumer without making someone pay more than adequate efficient service is reasonably worth, from a modern central or interconnected system, seems apparent for the reasons stated in the May case. █ The maintenance and operation of such a separate plant is really recognized as unnecessary for the service required by May's contention in its case that it is entitled to rates authorized by the commission for service through Union's present modern interconnected system and by the further contention that the Railway plant has been for several years maintained for standby service for the Union system rather than for any purpose of providing service for plaintiffs. If this latter contention is true enforcement of the contract provision for appraisement and transfer of the Railway plant to plaintiffs would directly violate Section 5195, Revised Statutes 1929, prohibiting the "transfer . . . of . . . any part of its . . . works or system . . . without having first secured from the commission an order authorizing it so to do," and providing that "every such . . . transfer . . . made other than in accordance with the order of the commission authorizing same shall be void." [See, also, Section 5205, R. S. 1929.] In any case, specific performance must always rest in the sound discretion of the court. [Rockhill

Tennis Club v. Volker, 331 Mo. 947, 56 S. W. (2d) 9, and cases cited.] Moreover, if plaintiffs do not get *adequate* service guaranteed to them by the Public Service Commission Act, they are given by that act a full, complete, and adequate method for obtaining relief. Many other questions are discussed in the briefs, but we hold that the trial court properly dismissed plaintiffs' bill for the reasons discussed herein and in the May case.

The judgment is affirmed. *Ferguson* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Douglas*, *J.*, not voting because not a member of the court when cause was submitted.