**C. T. CARTER, Respondent-Appellant,**

v.

**MATTHEY LAUNDRY & DRY CLEANING COMPANY, a Corporation, Mabro Investment Company, a Corporation, and National Laundry, Inc., a Corporation, Appellants-Respondents.**

No. 47142.

Supreme Court of Missouri,

Division No. 1.

Dec. 14, 1959.

Motions for Rehearing or to Transfer to Court en banc Denied Jan. 11, 1960.

Flynn, Parker & Badaracco, Norman C. Parker, St. Louis, for appellants.

August W. Jaudes, A. Robert Belscher, St. Louis, for respondent Carter.

COIL, Commissioner.

In March 1955 Matthey Laundry & Dry Cleaning Company, a corporation (hereinafter sometimes called Matthey), purchased 91 per cent (2,732 of a total 3,000 shares) of the stock of National Laundry Company, a corporation (hereinafter sometimes called National) at $40 per share on the terms and conditions contained in a written offer to purchase. In April 1955 the directors and stockholders voted to voluntarily dissolve National. C. T. Carter, plaintiff below and here both appellant and respondent, was president of National from 1936 to March 1955. He and Matthey entered into a contract dated March 22, 1955, which provided that in the event Matthey purchased at least 80 per cent of the stock of National, Carter would work for Matthey for at least three months at $230 a week and thereafter not engage in the laundry business in a designated area or own laundry stock. The contract provided further,

"Upon liquidation of the National Laundry Company in the event the proceeds of such liquidation exceed $115,000.00 Carter shall be paid an amount equal to the portion of such excesss distributable to Matthey by virtue of its ownership of stock in National Laundry Company which shall be paid to Carter in three equal annual installments, the first payment to be made upon receipt by Matthey of its final liquidating distribution of stock in the National Laundry Company, and the remaining payments to be made on the same date of each year thereafter for two years.

"In the event that the liquidation of National Laundry Company is completed in less than six (6) months, the minimum amount to be paid to Carter hereunder shall be Three Thousand Dollars ($3,000.00), irrespective of the actual amount of the proceeds of the liquidation, and in the event the liquidation is not completed until after six (6) months, the minimum amount to be paid to Carter shall be Five Hundred Dollars ($500.00), the first one-third (⅓) of which shall be payable May 1st, 1956, if the liquidation is not completed prior to that time."

The proceeds of the liquidation of National amounted to $114,720. Carter claimed in count 1 that Matthey had failed on liquidation to obtain the fair market value of the company's real estate and in count 3 that Matthey had failed to obtain the fair market value of the customer accounts, and that consequently Matthey was liable to him under the contract for 91 per cent of the amount over $115,000 which would have been received if proper amounts had been obtained for the real estate and customer accounts.

The liability of other defendants below who are here appellants and respondents, Mabro Investment Company, a corporation (hereinafter sometimes called Mabro), and National Laundry, Inc., a corporation (hereinafter sometimes called National, Inc.), was submitted on the theory that Mabro as to count 1 and National, Inc., as to count 3 conspired with Matthey to prevent plaintiff from receiving the money due him under his contract.

The jury's verdict was against plaintiff on count 1 and for plaintiff and against Matthey and National, Inc., in the sum of $14,000 on count 3. The trial court sustained plaintiff's new trial motion on count 1 on the ground that the verdict was against the weight of the evidence and sustained the new trial motions of defendants Matthey and National, Inc., on count 3 on the ground that plaintiff's verdict-directing instructions 3 and 4 were erroneous. Defendants Matthey and Mabro appealed from the trial court's order as to count 1 and plaintiff appealed from the trial court's order as to count 3.

In determining whether plaintiff made a submissible case on count 1 we state the evidence from a standpoint favorable to him.

National had done business for a long time with its offices and plant at Laclede and Channing in St. Louis. Its accounts were largely commercial, mostly hotels and motels. L. H. Matthey, Jr. (hereinafter called Matthey, Jr.), was Matthey's president, and in September 1954 negotiated with plaintiff to determine whether Matthey could hire plaintiff and, if not, whether National would sell either its stock or its customer accounts and trucks to Matthey. In November 1954, two written proposals were submitted by Matthey; one to purchase the 3,000 shares of stock at $40 a share and to liquidate the remaining physical assets and distribute to the then stockholders the money received on liquidation in excess of $120,000, and the other to purchase the customer accounts and trucks at the "going rate of 7 for 1 for the weekly business of the company plus an appraised value of the trucks." Neither of those proposals was accepted, but a later proposal which was incorporated in Matthey's written offer was accepted in February or March, 1955, by stockholders owning 91 per cent of the stock. The accepted pro-

posal entailed the purchase of the stock at $40 per share, payable as therein outlined (unimportant here).

Plaintiff, who personally owned 158 shares of the stock, recommended the sale to Matthey and considered $40 a share a fair price. Upon consummation of the sale, plaintiff resigned as president of National, was elected vice president and continued as such and as a director of the company until March 1956. He worked for Matthey as provided in the contract for three months, viz., April, May, and June of 1955, and one of his tasks was to handle the liquidation of the assets of National Laundry, and he and Matthey, Jr., proceeded to convert those assets to cash. As heretofore noted the present dispute has to do with disposition of the company's real estate (count 1) and its customer accounts (count 3).

National's real estate consisted of a 2-story building at 3401 Laclede, an adjoining flat, and a garage. This property was in the Mill Creek section and by the time of the stock sale that area was being considered publicly as a slum clearance project by the Land Clearance Authority. Plaintiff attempted to sell the real estate during the year between March 1955 and March 1956. He listed it for sale with a real estate firm at $60,000. He had talked with representatives of the Land Clearance Authority prior to the sale of the National stock and he and Matthey, Jr., talked with those representatives two or three times subsequent to the stock sale inquiring on the later visits when money for the National property would be available. No satisfactory answer was obtained, and no buyer was found because of the pending project. Plaintiff talked with or listed the property with three other real estate agents and Matthey, Jr., listed the property with still another. Through one an offer of $35,000 was received for the building and the adjoining flat and the laundry equipment. That offer was rejected. In January 1956 plaintiff heard talk of organizing a syndicate to buy the real estate and the

equipment for $41,500. Matthey, Jr., invited plaintiff to join such a syndicate and the real estate and equipment were offered to plaintiff individually at $41,500. Plaintiff refused either to join a syndicate or to purchase individually because he was not interested unless all of the nondepositing stockholders (the owners of a few shares of stock who did not sell to Matthey at $40 a share) went along.

At a meeting in March 1956 the board of directors of National (plaintiff protesting and voting against the proposal) approved the sale of the real estate, i. e., the three buildings and the equipment in the laundry building, for $41,500 to a syndicate which had been organized as Mabro. Mabro paid the $41,500 for the real estate and the equipment, and the equipment was almost immediately sold for $5,000. It is conceded that the real estate may be considered as having been purchased by Mabro for $36,500. Mabro had been incorporated March 19, 1956, by Matthey, Jr., who contributed $7,800 to its capital, Matthey, Sr., who contributed $13,500, and Robert B. Brooks, who contributed $3,200, and those three constituted the board of directors and officers and the company office was at Matthey's address. The $41,500 with which Mabro purchased the real estate was the cash paid in by the three individuals and the proceeds of a loan.

A witness testified that the fair market value of the real estate in question as speculation property at trial time was $70,000 and that its value was greater in 1956. Another witness testified that the real estate, assuming a willing seller and a willing buyer, had a value of $62,000. The witness further testified, however, that because the property in question was earmarked for land clearance, there was no willing buyer and no buyer at all except perhaps a speculator who would buy only if he could obtain the property at a discount which was usually figured in accordance with a certain table; and that if it had been estimated that the property was to be held for three years before condemnation was complete

the value was $46,500, and if it was to be held five years the value was $38,440.

Plaintiff testified that the original "deal" was made on the assumption that National would be liquidated in one year because of federal taxes, and that he, the plaintiff, was fully aware of that situation. He also testified, however, that the liquidation did not have to be completed in a year and there was testimony that liquidating in a year would primarily benefit Matthey because it was the largest stockholder. The federal tax regulation in question was one whereby if dissolution of a corporation was commenced and completed within a year no gain was recognized by the corporation on any transaction during the course of that year and a distribution in the course of such liquidation was not a dividend and the stockholders would not have to pay income tax on it, but only a tax on their capital gains.

In support of their contention that plaintiff failed to make a submissible case on count 1, defendants Matthey and Mabro say that the sale of the real estate was an open and aboveboard sale; that Mabro actually paid the $36,500; that the sale was made only after everyone concerned, including plaintiff, had endeavored to sell the property for a period of almost a year; that National's assets had to be sold in 12 months because of otherwise double federal income tax on the stockholders; that the fact that the liquidation was to be completed in a year was an integral part of the agreement and was expressly understood by the parties; that it was admitted that the property was under threat of condemnation and its salability was thereby hindered; that only after plaintiff declined to purchase or to join in the purchase was the sale to Mabro consummated; that the contract did not obligate Matthey to obtain any particular price; that the price at which it sold was the best price obtainable under the circumstances; that the testimony of plaintiff's witnesses as to market value was immaterial because their testimony did not relate to the best price obtainable under

the circumstance that it was to be sold within a year.

■ We are of the opinion that plaintiff did make a submissible case on count 1 and if so we may not properly say that the trial court abused its discretion in granting a new trial on the ground that the verdict was against the weight of the evidence. Moore v. Southwestern Bell Telephone Co., Mo., 301 S.W.2d 817, 820 [3].

■ The crux of defendant's contention is the assertion that the contracting parties agreed that liquidation had to be completed within a year. If that were true, there is obviously merit in defendants' position. We cannot agree, however, that the evidence showed that there was an agreement that the liquidation had to be, in all events, completed within a year. It is true that plaintiff testified that the "deal" was made on the assumption that the liquidation would be completed within a year and that he understood that. He also testified, however, that liquidation did not have to be completed within a year. It seems that the parties contemplated a liquidation by which all of National's assets were to be converted to cash rather than a liquidation in which some of the assets might be distributed in kind as they could have been under the provisions of RSMo 1949, § 351.470, subd. 3(2), V.A.M.S. But even so, the contract does not provide that the liquidation would, in all events, be completed within a year; a highly important provision and one easily included and one which it must be assumed would have been inserted by Matthey's attorney who drew the contract if it was a matter of original agreement. On the contrary, the contract contains language which indicates that the liquidation might not be completed within the year. The contract was dated March 22, 1955, and, while plaintiff testified that it was not signed until four or six weeks after that date, there was no evidence that the contract was not effective and was not intended to be effective as of the date it bore. The contract provided that if

the liquidation was not completed until after six months, "the minimum amount to be paid to Carter shall be Five Hundred Dollars ($500.00), the first one-third (⅓) of which shall be payable May 1st, 1956, *if the liquidation is not completed prior to that time.*" (Our italics.) Thus the very language of the contract indicated that the liquidation might not be completed until after May 1, 1956, which was a date more than a year after the effective date of the contract and more than a year after the stockholders had voted to voluntarily dissolve the corporation and the liquidating process had begun. Furthermore, a motion passed at a directors' meeting on April 5, 1955, provided that the liquidation proceed "as rapidly as possible" and be completed "as quickly as is feasible." There was no indication in that motion that the liquidation was to be completed in all events within one year. More significant, however, is the fact that the minutes of a special board meeting of June 10, 1955, recited that there was, at the meeting, a discussion as to the progress being made in the sale of the real estate and that it was agreed by the directors present that the impending slum clearance was hampering the sale and that it might be one to five years before the Land Clearance Authority would purchase the property; and in "the light of this the following action was taken." The board passed a motion "that at the expiration of the present agent's contract, the property be listed with an agent for either sale or *lease.*" (Our italics.) It seems that in June 1955 it was within the contemplation of the directors (including, at that meeting, Matthey, Jr., and the plaintiff, Carter) that it was desirable to consider leasing the property until such time as the Land Clearance Authority was ready to pay a fair price for it, clearly negativing the proposition defendants now assert that the mandatory completion of the liquidation process within one year was an integral part of the agreement between the parties. Under all the evidence we think plaintiff's testimony that the deal was made on the assumption that liquidation would be completed within a year must reasonably be construed as meaning that he understood that it was desirable to complete the liquidation in a year if such was feasible under all the circumstances.

Thus, if the real estate did not have to be sold within a year, the testimony of plaintiff's witnesses as to the fair market value of the property, which presumably would be paid in due course by the Land Clearance Authority did have probative value as evidence of the price which should have been received for the property in liquidation. And if the jury believed that the price which should have been received for the property was sufficient to have caused the total proceeds of liquidation to exceed $115,000, then the jury also could have found that plaintiff was entitled to damages under his contract.

Defendants Matthey and Mabro next contend that in no event did plaintiff make a submissible case against Mabro. The parties have briefed that question as though the theory on which plaintiff's recovery against Mabro was submitted was that Mabro was under the control, domination, and direction of Matthey and was its instrumentality through which it accomplished a wrong or injustice to plaintiff calling for a disregard of the separate corporate entities of Matthey and Mabro. While instruction 1 (the submission against Matthey) required a conjunctive finding that Mabro and its officers and directors were under the control and management of Matthey and that the actions of Mabro were the actions of Matthey, and while instruction 2 (the submission against Mabro) incorporated all the findings required in instruction 1, there can be no doubt that the theory upon which plaintiff's recovery against Mabro was submitted was that Mabro with full knowledge of the contract between plaintiff and Matthey, through its officers, directors, and stockholders, conspired and combined with Matthey for the express purpose of causing the real estate to be bought by Mabro at a price below its fair market value and to thereby prevent

plaintiff from receiving the amount due him under the contract.

Inasmuch as the trial court sustained plaintiff's motion for new trial on the ground that the verdict in favor of both defendants was against the weight of the evidence, and inasmuch as the parties on this appeal seem to indicate that the question of disregarding corporate entities is involved and inasmuch as plaintiff by his position here seems to indicate that he may intend to attempt to submit his case on such a theory on retrial, we should indicate our view in that respect.

■ It is clear that Mabro was the adjunct or instrumentality of Matthey and that both companies were under the control of the same persons and that the specific and only purpose of Mabro was to purchase the real estate here involved. But to impose liability on Mabro on the suggested theory it was necessary not only to show that it was the instrumentality of Matthey but also that a failure to disregard the separate corporate entities of Matthey and Mabro would result in a fraud upon or a wrong or injustice to plaintiff. 18 C.J.S. Corporations § 7, p. 385; May Department Stores Co. v. Union Electric Light & Power Co., 341 Mo. 299, 107 S.W.2d 41, 55[11]. The evidence in this record fails to show that any wrong or injustice will result to plaintiff by reason of Mabro's acquiring this real estate. Plaintiff sought only damages for breach of contract. No wrong to him is apparent unless by reason of Mabro's acquisition plaintiff is thereby unable to obtain a judgment for and collect damages from Matthey, the contracting party. In other words, there is no showing that plaintiff now needs the relief which might result from disregarding corporate entities.

It appears to us that the meritorious question as to Mabro's liability on count 1 is whether, as submitted by instruction 2, there was substantial evidence from which the jury reasonably could have found that Mabro and Matthey combined and conspired to prevent plaintiff from receiving what was due him under the contract and committed overt acts to accomplish their purpose. There was evidence that Matthey, Jr., was an officer, director, and stockholder in Matthey, and that L. H. Matthey, Sr., was a stockholder in that company; together they owned 372 of 479 outstanding shares. As noted heretofore, Matthey, Jr., and Matthey, Sr., were officers and directors of Mabro, and together they had contributed $21,300 of the $24,500 total capital of that company; Robert B. Brooks, the only other officer and director, furnished the other $3,200. We have noted that Mabro used the $24,500 so contributed and obtained a loan to make up the total of $41,500 which was used to purchase the real estate and equipment of National Laundry. Matthey, Jr., testified that the following question asked at a deposition correctly stated his position: "But you arrived at that figure because you took into consideration that it would take approximately a hundred and fifteen thousand dollars to pay the purchase price for the shares of stock at the rate of forty dollars per share, and you didn't want to go above the hundred and fifteen thousand dollars because anything above it you would have to turn over to Mr. Carter under the contract that he had with you?" We think it is a fair inference that the figure referred to as having been "arrived at" in the foregoing question was the $41,500 figure Mabro agreed to pay for the real estate and equipment of National Laundry.

There was evidence that Robert B. Brooks, a consulting engineer who had been working on a disposition of the property for Matthey, wrote Mr. L. H. Matthey on February 16, 1956, informing him that it was Brooks' opinion that "when the time comes" Mr. Matthey would receive from $10,000 to $15,000 more for the building than he had theretofore informed Brooks he was willing to settle for, and stating further that speculators were attempting to determine what appraisals had been made so they could buy at a low price,

"then holding the buildings for a couple of years and make a handsome profit for themselves." There was a later letter, March 20, 1956, from Robert Brooks and Joseph Brooks (Robert's son) to Matthey, Sr., and Matthey, Jr., accepting a proposition theretofore made by Matthey, Sr., and Matthey, Jr., and which Matthey, Jr., testified constituted an agreement between Mabro and the Messrs. Brooks. That letter outlined an arrangement whereby Brooks would make further study of the property, evaluate it, continue to negotiate with federal authorities looking toward a fair sale price, made a trip to Washington to discuss the matter with the Urban Redevelopment Authority, and suggesting that if there was no quick settlement, it would take about 1½ years to effect a settlement; and stating further that for those services the Brooks were to be paid 25 per cent of any money received for the properties over and above the base price of $40,000 in addition to a monthly retainer of $50 which was to be deducted from the total fee mentioned.

We think the jury reasonably could have found from all the evidence that immediately prior to the purchase of National Laundry real estate by Mabro, Matthey, Sr., and Matthey, Jr., who controlled Matthey and who also controlled Mabro, the purchaser of the property, and Brooks, a Mabro officer, director and stockholder, knew that by holding the property a price substantially higher than $36,500 would be obtained for it; that such higher price, if received by National Laundry as part of the proceeds from the liquidation of its assets, would have caused the total liquidation price to have exceeded $115,000 by a substantial amount and thus would have resulted in an amount due plaintiff under his contract; that the $41,500 price ($36,500 for the real estate) was determined to prevent the total proceeds from the liquidation of National Laundry's assets exceeding $115,000 for the purpose of making for themselves as Mabro's stockholders money that should have been paid to plaintiff under his contract with Mat-

they. And we are of the opinion that the jury was entitled reasonably to infer from the foregoing that Matthey and Mabro conspired to, intended to, and did handle National Laundry's real estate in such a manner as to prevent plaintiff from receiving the money due him under his contract, and that Mabro was thereby jointly liable with Matthey for the damages, if any, sustained by plaintiff on count 1. See Hart v. Midkiff, Mo., 321 S.W.2d 500, 507.

In reviewing the evidence we have accorded plaintiff the favorable inferences which reasonably may be drawn therefrom. We perhaps should state that under another view of the evidence the jury's verdicts for defendants on count 1 may have been justified. Our province on this review, however, is not to determine whether there was evidence which, if believed, justified the verdicts, but only whether there was substantial evidence to support the action of the trial court in sustaining the new trial motions on the ground that the verdicts were against the weight of the evidence. To so determine, we need find only, as we have found, that plaintiff made a submissible case against defendants. Moore v. Southwestern Bell Telephone Co., supra, 301 S.W.2d 823.

Plaintiff's verdict on count 3 was for $14,000 against Matthey and National, Inc. The trial court granted defendants a new trial on the ground that instructions 3 and 4 were erroneous in that they failed to submit whether, but assumed as a fact that, good will was an asset of National Laundry which was to be liquidated within the intent of the parties to the contract. The trial court in a memorandum took the view that that question was a sharply contested issue and that a jury finding thereon was essential to plaintiff's recovery. Plaintiff contends that there was no issue for the jury as to whether good will was an asset to be liquidated because the language of the contract referred to liquidation without exception

and that liquidation, unqualified, called for disposition of all assets including the customer accounts and good will; and that the evidence showed that the customer accounts with attached good will was a valuable, salable asset and failure of Matthey to have sold it and thus to have increased the total received in liquidation of National's assets above $115,000 deprived plaintiff of money due him under the contract. Defendants Matthey and National, Inc., contend that plaintiff failed to make a submissible case against either of them on count 3 and, alternatively, if a submissible case was made the trial court erred in giving instructions 3 and 4 essentially for the reason stated by the trial court. Defendants contend not only that the evidence affirmatively shows that the parties did not intend that customer accounts and attendant good will would be accounted for on liquidation but, further, that plaintiff judicially admitted that he had no claim by reason of the disposition of National's good will.

The evidence clearly showed that when the parties used the term "good will" at the trial, they referred to National's customer accounts with whatever good will was attached when they were taken over by another operating laundry. Thus, the so-called "good will" issue is in reality the question whether National's customer accounts constituted an asset which should have been sold for value upon dissolution and liquidation of National and the proceeds thereof considered in determining the amount, if any, due plaintiff under his contract.

The evidence was that after March 23, 1955 (the date Matthey completed its stock purchase), National was no longer operated as a going business. For a short period of time its customer accounts were serviced by Matthey under the designation "National Laundry 'M.'" On May 4, 1955, National, Inc., was incorporated and its certificate to commence business issued on May 20. Matthey, Jr., was president, and he and Matthey, Sr., were directors, and together owned 405 of the total 500 shares. National, Inc., was organized for the specific purpose of taking over and servicing the customer accounts of National. National, Inc., to accomplish that purpose, entered into an arrangement with Matthey whereby Matthey performed the laundry service for National, Inc., at a 35 per cent discount. National, Inc., during its first two years of operation, made a total profit of about $17,000. Matthey, Jr., conceded that the customer accounts of National had some value at the time National, Inc., acquired them.

Defendants, to support their contention that the parties did not intend that customer accounts would be considered an asset for the purpose of determining the amount received on liquidation, point to the letter of November 10, 1954, from Matthey to plaintiff, to which we have referred heretofore, and in which the two proposals were submitted. It will be recalled that proposal No. 1 therein contemplated the purchase of the stock and it was specifically stated therein that no amount would be paid for National's customer accounts. Defendants say that is a circumstance surrounding the negotiation and execution of the contract which indicated that it was understood by the parties that customer accounts was not an asset to be liquidated. We think defendants are mistaken for these reasons. The proposal referred to was never accepted. That proposal was to purchase stock and thus it was inappropriate and irrelevant to mention any particular asset or item which would or would not be paid for, other than perhaps to demonstrate how the price-per-share offer was determined; for when stock is purchased at so much a share it includes every asset of the corporation. Most important, however, is the reason that all that the circumstance noted (the unaccepted proposal of November 1954) could possibly indicate was that Matthey in proposing to pay $40 a share for the stock had ascribed no value to National's customer accounts because, as stated in the letter, Matthey

thought other considerations would offset the value of those accounts. That fact, as we see it, could have nothing whatever to do with determining whether customer accounts constituted an asset to be liquidated for the purpose of computing the amount due plaintiff under the contract. The purchase of the National stock by Matthey was a separate and distinct transaction from and was not tied to the contract between Carter and Matthey. And the price paid by Matthey for National's stock and how either party determined that $40 was a fair price therefor could not, unless specifically made so by explicit language, be relevant to the question of what assets of National were to be liquidated for the purpose of determining whether the total proceeds on liquidation exceeded $115,000 under the provisions of plaintiff's contract with Matthey.

Defendants attach some importance to the fact that National's accounts receivable were sold to defendant National, Inc., for $7,283.71, and that National's board consented that the name "National Laundry Company" could be used by any corporation designated by Matthey, Jr. We are unable to discern how either fact supports defendants' interpretation of plaintiff's contract. We see no necessary connection between "accounts receivable" and "customer accounts." The sale of accounts receivable, if collectible (and the testimony shows that those accounts were collected in full), amounted to a transfer of cash and not to a payment for "customer accounts." The fact that National consented that its name could be used had nothing to do with whether National's customer accounts should have been sold in liquidation and the price received accounted for under plaintiff's contract.

Defendants also suggest that "good will" as such was never conveyed to anyone and that no one had ever agreed to pay for the good will. As we have indicated, there was some interchange in the testimony and in the instruction of the terms "good will" and "customer accounts," but

it is clear that we are here dealing with customer accounts as such and that good will is involved only as it might be evidence indicating one element of value inhering in the total value of the customer accounts.

We cannot escape the conclusion that the language contained in plaintiff's contract, viz., Matthey shall "pay to Carter a sum computed as follows: Upon liquidation of the National Laundry Company in the event the proceeds of such liquidation exceed $115,000.00 Carter shall be paid * * *," and particularly the word "liquidation" and the words "proceeds of such liquidation," in the absence of any limiting or qualifying language, must be held to mean liquidation of *all* the assets of National and the total amount received therefor. When Matthey bought the stock of National it thereby acquired all the assets, including customer accounts with whatever good will attached to them. Matthey caused National, Inc., to be formed and it took over those customer accounts without paying therefor or without ascribing thereto any value for the purpose of determining the total of the proceeds of liquidation under plaintiff's contract. The evidence shows that those customer accounts constituted an asset with some value and it was encumbent upon Matthey to ascribe to that asset a fair value in order that the total amount of the proceeds of liquidation could be determined. Certainly if any asset of National was not to be liquidated for the purposes of the contract it was encumbent upon Matthey, whose attorney drew the contract, to include language explicitly excepting any asset which was not to be taken into account in determining the proceeds of liquidation.

■ Defendants say further that plaintiff's testimony at the instant trial considered with an admission he made in a letter of March 7, 1956, to National's board of directors, precluded plaintiff from contending that he had a claim by reason of the

disposition which had been made of the customer accounts. That letter said inter alia, "It has been agreed by both parties that I personally have no interest in the Company's Good-Will under my contract with the Matthey Laundry & Dry Cleaning Company." At the instant trial plaintiff testified that he tried to get Matthey, Jr., to agree that something would be paid for good will (customer accounts) to protect the nondepositing stockholders, and that he proposed that if Matthey, Jr., would pay for customer accounts he, plaintiff, would have no interest in the proceeds of the customer accounts asset and would reimburse Matthey for whatever amount was paid to plaintiff on account of the sale of customer accounts; that is to say, for example, if the payment made by National, Inc., for customer accounts caused the proceeds of liquidation to exceed $115,000 by the amount of $1,000 Carter would have received 91 per cent of that $1,000 under his contract and would return $910 to Matthey. Plaintiff testified further that while Matthey, Jr., admitted that customer accounts had value he refused to cause any payment to be made and thus refused to accept plaintiff's offer; that both the statement in his letter and his testimony at the present trial aforenoted were contingent upon Matthey, Jr., agreeing to his proposal and inasmuch as no such agreement was made he considered himself not bound by his proposal and sought to recover all the money due him under the terms of his contract.

Defendants have cited Smith v. Siercks, Mo., 277 S.W.2d 521, and other cases which indicate the circumstances under which a judicial admission is binding upon a party litigant. The difficulty is that the principle is not applicable to the facts of this case. Here plaintiff explained his prior extrajudicial statement and his testimony at the instant trial that he had no interest in any amount received by reason of the disposition of customer accounts and that he would return any amount received on account thereof and that his only interest was to protect nondepositing stockholders. Whether his explanation was satisfactory was a matter for the jury. We properly may not hold that, as a matter of law, plaintiff was precluded from claiming an amount by reason of the disposition of National's customer accounts.

Defendants next contend that in no event did plaintiff make a submissible case against National, Inc. Again, as with the matter of Mabro's liability on count 1, the parties have discussed the question whether the separate corporate entities of Matthey, and, in this instance, National, Inc., should be disregarded. What we have said heretofore with respect to that question as it related to Matthey and Mabro on count 1 applies with equal effect to the question here presented as to Matthey and National, Inc. Again, also, however, the fact is that instruction 4, which authorized the jury to find a verdict against National, Inc., did not seek to impose liability on National, Inc., on the theory that corporate entities should be disregarded, but authorized the jury to find against National, Inc., if it found against Matthey under instruction 3 and if it found, in addition, that National, Inc., had knowledge of the contract between plaintiff and Matthey and that National, Inc., conspired and combined with Matthey to cause National's customer accounts to be acquired by National, Inc., at a price below their fair market value for the purpose of depriving plaintiff of money due him under the terms of his contract.

We have heretofore set forth the evidence with respect to the identities of the controlling personnel of Matthey and National, Inc. Without extending this already long opinion by again reviewing the circumstances under which National, Inc., was organized and thereafter acquired and used and made money from the customer accounts of National without paying therefor, we are of the opinion that there was sufficient evidence from which a jury reasonably could have found that National, Inc., and Matthey conspired to, intended

to, and did dispose of National's customer accounts in such a manner as to prevent plaintiff from receiving money due him under his contract and that National, Inc., was thereby jointly liable with Matthey for the damages sustained by plaintiff on count 3.

As noted, the trial court granted Matthey and National, Inc., new trials on the ground that instructions 3 and 4 were erroneous in that they assumed that, instead of requiring the jury to find that, the customer accounts was an asset to be considered in determining whether the proceeds of National's liquidation exceeded $115,000. We think the trial court correctly ruled in that respect. Plaintiff's extrajudicial admission against interest contained as a statement in a letter to National's board under date of March 7, 1956, was: "It has been agreed by both parties that I personally have no interest in the Company's Good-Will under my contract with the Matthey Laundry & Dry Cleaning Company." As we have heretofore pointed out plaintiff explained that statement. The jury could believe or not believe his explanation. Standing alone, the admission supports a reasonable inference that plaintiff and Matthey had entered into a valid supplemental agreement providing that National's customer accounts were not to be liquidated or their value considered in determining the amount due plaintiff under his written contract with Matthey. That being true, it was necessary that plaintiff's recovery instructions on count 3 require the jury to find that the customer accounts constituted an asset which was to be liquidated or whose fair value was to be considered in determining the amount of the proceeds of liquidation under plaintiff's contract with Matthey.

The orders of the trial court granting plaintiff and defendants Matthey Laundry and Dry Cleaning Company and National Laundry, Inc., new trials on counts 1 and 3 respectively are affirmed and the case is remanded for a new trial.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.