George W. MILLER, Marie McCanles and A. C. Bay, Trustees, Appellants,

v.

Arthur FELS, Arthur Fels Co., Formerly Arthur Fels Bond & Mortgage Co., and Western Holding Corporation, Respondents.

No. 50410.

Supreme Court of Missouri,

Division No. 1.

Sept. 14, 1964.

Rehearing Denied Oct. 12, 1964.

Paul Van Osdol, Jr., Lynn C. Hoover, Terrell, Hess, Van Osdol & Magruder, and Edmund B. Smith, Courtney W. Perkins, Meyer, Smith, Shute & Penner, Kansas City, for appellants.

Lawrence R. Brown, Alvin D. Shapiro, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, for respondents.

WELBORN, Commissioner.

This action was brought by George W. Miller, Marie McCanles and A. C. Bay, as statutory trustees of a defunct corporation, Ward Park Building Company, against Arthur Fels, Arthur Fels Co. (formerly Arthur Fels Bond & Mortgage Co.) and Western Holding Corporation. The plaintiffs sought a declaratory judgment that they were the owners of $30,000 first mortgage bonds in the possession of the defendants. The bonds were claimed to be secured by a first mortgage deed of trust on an apartment building in Kansas City, known as Casa Loma West, title to which was held by Western Holding Corporation. The petition also sought a decree of foreclosure of the deed of trust securing the bonds. After hearing the evidence offered by the parties, the trial court sustained the defendants' motion for judgment as a matter of law. After their motion for new trial had been overruled, plaintiffs appealed to this court. We have jurisdiction by reason of the amount in controversy.

Ward Park Building Company (herein referred to as "Ward Park") was a Missouri corporation. The principal stockholders were George W. Miller and Guy H. McCanles. (McCanles died in 1932. His widow, Marie McCanles, was a member of the last board of directors of Ward Park.) The third stockholder was A. C. Bay, who held only qualifying shares. In 1929, Ward Park proposed to erect an apartment building in Kansas City, to be known as Casa Loma West. In March, 1929, an agreement was entered into between Ward Park, Miller and McCanles, referred to collectively in the agreement as "the BORROWER," and Arthur Fels Real Estate Mortgage Company, a predecessor of the defendant Arthur Fels Company, as "the LENDER." The Fels company agreed to obtain for the borrower a loan of $325,-

000, to be secured by a first mortgage deed of trust on property in Kansas City and the apartment building proposed to be erected thereon with the proceeds of the loan. The deed of trust and bonds evidencing the indebtedness were to be executed by an individual and the bonds endorsed by Ward Park.

The agreement provided that the lender should receive a commission of $29,250 for negotiating the loan. In addition, "Borrower" agreed to purchase $30,000 of the bonds to be executed. "Borrower" further agreed "as additional security and protection for the Lender," to place such bonds in escrow with the Commerce Trust Company under an escrow agreement whereby the escrow agent would retain the $30,000 of bonds until such time as the original amount of the $325,000 loan had been reduced by $50,000. On such occurrence, the $30,000 in bonds were to be surrendered to "the Borrower." The agreement provided that, in the event of default in payment of the bonds or other terms of the deed of trust prior to the reduction of the indebtedness to $275,000, the $30,000 of bonds were to be subordinated "to the full other balance of principal obligation remaining unpaid."

On March 25, 1929, a first mortgage deed of trust was entered into between George C. Low and Helen Low, husband and wife, straw parties for Ward Park, Grant I. Rosenzweig, Trustee, and Arthur Fels Real Estate Mortgage Co., as financial agent, on the Casa Loma West property, to secure the agreed upon loan of $325,000, evidenced by bonds executed by the Lows, payable to the Fels company, and endorsed by Ward Park, maturing between October 1, 1930, and April 1, 1936, at interest rates of 6% and 6½% per annum. The bonds were delivered to the Fels company, which proceeded to sell them, endorsing them to the purchasers without recourse. The Fels company was unable to market the entire issue and itself held a considerable amount of the bonds. The proceeds of the loan were made available to Ward Park and the apartment

building constructed as agreed. $30,000 in bonds, maturing April 1, 1936, were delivered in escrow to Commerce Trust Co., under the above-mentioned terms. The closing statement of the Fels company for the loan showed a debit of the $30,000 face amount of the bonds and accrued interest. No money was actually paid by "the Borrower" for the bonds.

On June 15, 1929, the Lows, for a consideration of $1.00 conveyed by warranty deed to Ward Park the property covered by the deed of trust. The deed recited that the property was subject to the deed of trust, but the grantee did not assume the grantors' obligations under the deed of trust.

The Casa Loma West apartment building was completed, but by that time the depression began to take hold. Ward Park experienced difficulty in obtaining sufficient income from the project to pay the interest on the bonds and the principal as they matured. Some $37,500 of the bonds had been purchased by H. K. Negbaur. $8,000 of the Negbaur bonds were due October 1, 1931, and the balance at various dates to October 1, 1933. On December 4, 1931, an agreement was entered into between Ward Park, executed by Miller as its president, Miller, individually, McCanles, Negbaur and the Fels company. By this agreement, the maturity dates of the Negbaur bonds, except for $8,000 worth maturing October 1, 1931, which were to be paid, were extended to April 1, 1936, the date at which the last maturing bonds of the issue were to mature. The agreement further provided that the $30,000 in bonds held in escrow by Commerce Trust should, as soon as they were freed from the escrow, which was continued in effect under its original terms except for providing that interest need not be paid on the escrowed bonds, be delivered to Negbaur as additional and collateral security for his bonds.

The operation of Casa Loma West continued to present financial problems. Although some $24,000 of the bonds were re-

tired, by November 29, 1933, the bonds were in default and Ward Park was unable to make interest and principal payments as they became due. On that date, in lieu of foreclosure of the deed of trust, Ward Park transferred the property by warranty deed for a consideration of $2,000 to Western Holding Corporation, a wholly owned subsidiary of the Fels company. The deed recited that the property was subject to the deed of trust, but the grantee did not assume the obligations of the mortgage.

On January 1, 1934, the Secretary of State of Missouri forfeited the charter of Ward Park.

Western Holding proceeded to operate the Casa Loma West. Some payments of interest, at a reduced rate, were made on the bonds, but the only reduction in principal amount was by the surrender of $10,000 face value of bonds owned by tenants of the apartment building, in payment of rent.

At some date, not shown in the record of the trial, the Fels company began to purchase, at face value, the Casa Loma West bonds from holders. According to J. Ralph Fels, executive vice-president of the Fels company, "(W)e had sold these to these good customers in good faith, and on our recommendation they bought them, and we thought it was a moral obligation." On October 16, 1950, the Fels company entered into an agreement with Negbaur's heirs to purchase at their face value $32,000 of the bonds owned by Negbaur at his death. Payment was to be made over a period of approximately two years. The purchase agreement provided that Fels should receive all interest of the sellers in the agreement dated December 4, 1931, pertaining to the $30,000 escrowed bonds. In July, 1952, Fels completed the purchase of the Negbaur bonds. On July 3, 1952, Commerce Trust Co. released the $30,000 in bonds to the Fels company on its indemnification receipt.

On June 26, 1952, Miller's attorney had written Commerce Trust, stating: "This is to advise that Mr. George W. Miller claims both the title and right to possession of those ($30,000) bonds and herewith advises that they should not be delivered to the Arthur Fels Bond and Mortgage Company but should be delivered to George W. Miller." Subsequently, on February 22, 1954, attorneys for the plaintiffs as statutory trustees, wrote Fels: "We are asking that you advise us of the basis on which said bonds were claimed by you, and on what terms you now hold them." No reply to this inquiry was received.

On March 31, 1955, this action was filed in the Jackson County Circuit Court. By the first count of their petition, plaintiffs sought, on the basis of the above transactions, a declaratory judgment as to the respective right of the plaintiffs and the defendants in the $30,000 bonds, and asked the court to declare plaintiffs to be their absolute owners, free and clear of all claims of defendants. Count II prayed for judgment of foreclosure of the deed of trust securing the bonds. The case was tried on a first amended petition filed April 5, 1963, asking the same relief as that sought in the original petition, but expanding somewhat on the allegation of Count II. The defendants filed a general denial and also alleged the following now relevant defenses: (1) That the petition failed to state a claim upon which relief may be granted; (2) That both counts are barred "by the relevant Statutes of Limitation"; (3) That the causes of action accrued, if at all, to an extinct corporation and are not part of the "winding up" of the corporation's affairs; that the agreement sued upon was abandoned by the plaintiffs' corporation; (4) That Section 4622, RSMo 1929, Section 351.525 note RSMo 1959, V.A.M.S., under which plaintiffs purported to act, does not authorize plaintiffs to bring this action; (5) That plaintiffs have been guilty of laches.

At the trial, documents pertaining to the several transactions were introduced in evidence, along with a stipulation of facts

and some oral testimony. About the only disputed fact arose from the recital in the Negbaur agreement "* * * (which $30,000 of mortgage bonds McCanles and Miller state are exclusively owned by them, subject to said escrow agreement affecting the same)," and the statement of Miller's attorney in his letter of June, 1952, to Commerce Trust, in which he stated: "This is to advise that Mr. George W. Miller claims both the title and right to possession of those bonds." The defendants pointed to these statements as inconsistent with the claim of plaintiffs' petition that the bonds were part of the assets of the defunct Ward Park corporation. Inasmuch as the trial court made no findings of fact and entered only a general judgment in response to the defendants' motion at the close of the entire case, we do not know whether the ruling of the trial court was in any manner based upon this disputed factual matter.

On their appeal, plaintiffs assert that, as a matter of proper procedure in response to Count I of their petition, praying for a declaratory judgment, the court should not have entered a general judgment, but should have declared the respective rights of the parties in the disputed bonds. The plaintiffs further contend that such judgment should have declared that they are the owners of the bonds and entitled to their possession. Stated as simply as possible, plaintiffs' theory is that the $30,000 bonds were to become fully matured obligations only upon the satisfaction of the original escrow agreement and the Negbaur agreement; that the conditions of the escrow agreement were satisfied upon the release of the bonds from escrow on July 3, 1952, and that the conditions of the Negbaur agreement were likewise satisfied at that time; that the Fels company's claim that the Negbaur and other bonds purchased and held by them had not been retired should be ignored; that the corporate entities of the Fels company and its wholly owned subsidiary, Western Hold-

ing, should be pierced and the two corporations treated as a single entity; that to do so would merge all forms of title and interest in a single entity, thereby extinguishing the outstanding bonds held without cancellation by the Fels company, secured by the deed of trust on the property, title to which was in Fels' wholly owned subsidiary, Western Holding; that, viewed in such light, the condition of the escrow agreement had been satisfied and the bonds should have been tendered to plaintiffs and placed in line for payment as fully matured obligations.

Appellants in this court base their right to relief upon the treatment of the purchaser of the outstanding bonds, the Fels company and its wholly owned subsidiary, Western Holding Corporation, as a single entity. To do so, according to appellants, would produce a merger of the security interest and the equity of redemption under the deed of trust, thereby discharging the bonds which Fels acquired and producing the satisfaction of the escrow conditions which would entitle the appellants to the possession of the previously escrowed $30,000 bonds. In their brief, appellants' position is stated as follows:

"Respondent Arthur Fels is the owner of all but qualifying shares of Respondent Fels Company,[1] and Respondent Fels Company is the owner of all but qualifying shares of Respondent Western Holding Corporation. Respondent Fels is the managing officer of both corporations. Respondent Fels and members of his family make up the Board of Directors and officers of both corporations. All the bonds, except those of Appellants, have been acquired and are held by Respondent Fels' company. In fact, the bonds originally belonging to members of Respondent Fels' family were acquired by Fels. Title to the property was taken

1. Arthur Fels, on his deposition, testified that he owned approximately ⅔ of the outstanding shares of the Fels company and that his son, J. Ralph Fels, owned the remainder except for qualifying shares.

in the name of Western Holding Corporation and not Fels' company. Fels' company acquired the bonds at face value long after they were in default. At least some of the bonds were acquired under the intimation that they were being retired. Fels Company has not appointed a successor trustee.

"By Fels separating the ownership of the various rights, titles and interests of the Fels complex, the reason for separation is apparent. The obvious purpose is to prevent a merger of all bonds by merger of all forms of title and interest in one person and thus present retirement of the escrow bonds. Fels Company has inequitably used its fiduciary position as financial agent to prevent satisfaction of the bonds and has acquired a valuable property for far less than its market value."

Several years ago, this court, in May Department Stores Company v. Union Electric Light and Power Co., 341 Mo. 299, 107 S.W.2d 41, 55, laid down the test to be applied in determining whether or not the circumstances of a particular case warranted equity's disregard of the "technical legal barriers" of the corporate form. In that case the court stated:

"Perhaps broader phases of the matter of limitations upon limited liability of corporate stockholders in other corporations should always be a legislative rather than a judicial question. It does seem, however, that the determination of whether there is a case for equitable relief could and should be decided by the test of whether or not the arrangement involved is being used for a proper purpose. Should not all these other suggested tests be used only as aids for determining the true purpose of the arrangement? Making a corporation a supplemental part of an economic unit and operating it without sufficient funds to meet obligations to those who must deal with it would be circumstantial evidence tending to show either an im-

proper purpose or reckless disregard of the rights of others. Equity sets aside legally sufficient conveyances if their purpose is to defraud creditors. If any intercorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, certainly equity does have the authority to tear down technical legal barriers and reach beyond them to impose liability or grant proper relief. If the purpose is lawful, and fair and equitable to those with whom it is intended to deal, legal forms and relationships should be observed. Men have the right to use legal forms which they believe to be helpful in accomplishing proper purposes. The question should not be merely 'instrumentality,' but 'instrumentality for what purpose.' Cases in many fields of the law turn on intent or purpose. 'Things do not have to be in broad contrast to have different practical and legal consequences. Actions take estimation from degrees, and of this life and law are replete with examples.' Industrial Accident Commission v. Davis, 259 U.S. 182, 42 S.Ct. 489, 491, 66 L.Ed. 888."

See also Carter v. Matthey Laundry and Dry Cleaning Company, Mo.Sup., 330 S.W. 2d 771, 777(4); Schwartz v. Shelby Construction Co., Mo.Sup., 338 S.W.2d 781, 793–794(13, 14).

According to appellants: "The actions of the Respondents are neither fraudulent nor illegal; however, they are unjust." The different entities of the Fels complex are being used "for an improper purpose." "By holding equitable title to the building in a wholly owned subsidiary and the obligations of the building in the parent, and refusing to appoint a trustee to hold legal title, Fels and his corporations have completely precluded the natural satisfaction of the escrow and subordination conditions and forced Appellants to seek the aid of the equity powers of the court to stop Fels' improper and unjust use and misuse of the corporate privilege."

Appellants do not accuse the respondents of improper use of their corporate structure on their original acquisition of the Casa Loma West. Although it does not appear in the record, the plaintiffs as officers and directors of Ward Park were undoubtedly aware in 1933, when they conveyed the apartment to Western Holding, that they were dealing with a Fels subsidiary. There is no claim that such facts were unknown to the appellants or that they were unaware of the relationship between the Fels company and Western Holding. Rather than have the deed of trust foreclosed, the appellants as officers of Ward Park conveyed Ward Park's equity to Western Holding and received $2,000 therefor. Appellants say that this conveyance was intended for the "benefit of outstanding bondholders, including Fels Company and Ward Park." However, we would be inclined to believe that the interest of Ward Park as a bondholder at that time was not a major consideration in the transfer. Ward Park was, as the endorser for its accommodation maker, the principal obligor on the bonds. Whether or not Ward Park had other assets than Casa Loma West and other liabilities than the bonds does not appear. According to Miller, Ward Park was "defunct." If it had other assets, it was undoubtedly primarily concerned with the extent of its liability on the $271,000 outstanding bonds owed others rather than with its $30,000 holdings. Fels was concerned as the seller of the bonds and as the holder of some $54,000 of them that were in default. By the subordination agreement the $30,000 bonds could have little or no value unless the operation of Casa Loma West became successful.

In any event, appellants find nothing sinister in the original transaction. Fels had numerous interests, including loans and insurance, as well as the ownership of property. That the different corporate entities participated in separate aspects of the overall enterprise does not by and of itself show improper use of the corporate form.

According to the appellants, the Fels design took on sinister aspects sometime after the Fels company began to acquire the outstanding Casa Loma bonds. Appellants' theory is that this was conceived as a device to avoid reduction of the outstanding indebtedness and thereby defeat the appellants' right to the $30,000 bonds. No direct evidence of such purpose appears.

Actually there is no showing just when the Fels company began to acquire the outstanding Casa Loma bonds. Appellants' brief places it "at some indefinite point in time." Insofar as it appears, that "indefinite point in time" may have been after the statute of limitations had run on the bonds. At least a sizable amount of the bonds was acquired subsequent to 1946, with the last acquisition in 1958. Western Holding's payment of interest would not have extended the obligation (Coleman v Trueblood, 351 Mo. 188, 172 S.W.2d 863, 865(2, 3)) and there is no showing of any agreement or promise on the part of either Fels or Western to pay the bonds.

According to the appellants, they first became aware of Fels' sinister design when they learned that Fels was seeking to obtain possession of the escrow bonds in 1952, following their acquisition of the Negbaur bonds. However, at that time Ward Park had been out of existence for almost twenty years. Ward Park had simply walked away from the obligation which it owed upon the outstanding bonds. Ward Park having been out of the picture for nearly twenty-four years insofar as its obligation was concerned, Fels may well, without wrongful design, have surmised that Ward Park was equally out of the picture insofar as the escrowed bonds were concerned. We cannot say that at that time an improper use of the corporate structure sprang into being which causes us to consider from that moment the Fels company and Western Holding a single entity.

Clearly, there was no showing on the part of appellants of an improper use of a mul-

tiple corporate structure such as was found to exist in the May Department Store case, *supra*, cited and relied upon by appellants. In that case, the court found that a subsidiary corporation of Union Electric was used for the sole purpose of permitting a charge for public utility service in excess of that permitted by the Public Service Commission. Such purpose was held "not proper or lawful, because evasion of the law for uniform regulation of public utility rates will not be permitted by such a device; * * *." Here, appellants make no claim that the arrangement of Fels violates any statute or other rule of law. They do not contend that, as to the bondholders from whom the Fels company acquired the bonds, the arrangement was not "fair and equitable." Certainly, the arrangement was as much "intended to deal" with them as with appellants. Appellants have failed to show that as to them, the arrangement was for such an improper purpose as to disregard "legal forms and relationships."

What of the injustice of which the appellants complain? Ward Park owed Fels, the original payee of the bonds, $30,000 for the bonds it agreed to purchase. However, rather than pay Fels for the bonds and have Fels pay Ward Park the total amount of the loan, Fels merely paid Ward Park $295,000 less its $29,250 commission, and delivered to Ward Park $30,000 in bonds. According to appellants, this $30,000 represented "land, labor and entrepreneural ability" supplied by Ward Park and its officers and stockholders. Ward Park did supply the land. Its value does not appear.[2] The labor contributed by Ward Park likewise does not appear. Undoubtedly Mr. Miller had considerable entrepreneurial ability. He apparently was successful in numerous ventures and Casa Loma West was undoubtedly largely a victim of the times in its early operations. In any event, the contributions

of Ward Park and its stockholders and officers were insufficient to make a success of the Casa Loma operation. Despite their efforts the first mortgage bonds fell into default. Casa Loma West was transferred to Western Holding for $2,000 in cash and the corporate existence of Ward Park was terminated by the Secretary of State on January 1, 1934.

The evidence is sparse as to the operation of Casa Loma West following its acquisition by Western Holding and until the wartime and postwar years. However, it can safely be assumed that, in view of the termination of Ward Park's existence, it contributed nothing further to the operation. The evidence does not show how the bondholders were fended off following Western Holding's acquisition of the apartment. The appellants intimate that the death of the trustee under the deed of trust and the failure of the Fels company as the financial agent possessing the power to designate a successor trustee to exercise such power may have influenced an apparent lack of action on the part of the bondholders to press for foreclosure of the deed of trust. Again, however, there is no showing when Mr. Rosenzweig, the original trustee, died. Had he died after April 1, 1946, when the period of limitations had run on the bonds, failure to appoint a successor trustee might have been less significant than it would have been should his death have occurred prior to April, 1946. In any event, in some manner Western Holding was able to continue the operation of Casa Loma West without paying the matured and maturing bonds. Undoubtedly, the wartime demand for apartments and the postwar inflation contributed to the ultimate success of the Casa Loma West operation. By Miller's estimate the value of the building in 1963 was $750,000. As above referred to, the appellants' claim

---

**2.** An offering circular for the bonds placed the land's appraised value at $36,000. However, other estimates in the circular give rise to the question of whether or not this was a wholly realistic figure. The circular projected gross income of $106,320 per year from the operation of the apartment. Western's gross receipts ranged from $40,413 in 1934 to $92,077 in 1953.

of injustice is based to some extent upon their contention that Fels had obtained a building of this value for an outlay of a considerably smaller sum of money. However, had the deed of trust been foreclosed in 1933 and a purchaser found who could have continued its operation and held the property until 1958, he undoubtedly would have reaped the same benefit and the appellants would be in no different position than they are now.

Fels declined to estimate the present value of the apartment building, but the income and expense figures indicate that the operation became increasingly profitable. All of this undoubtedly contributed to Fels' recognition of its "moral obligation" to the holders of the bonds. However, Fels and Western Holding did see the operation through to an apparently successful conclusion.

■ Wherein then does the injustice lie? Fels has not seen fit to assume the purchase from the appellants or the redemption of the $30,000 escrowed bonds. This action is directed, in effect, at forcing them to do so. Again, however, the appellants are trying to compel payment of an obligation on which they are the principal obligors. They effectively rid themselves through the forfeiture of the Ward Park corporate charter of the principal and interest obligation on the major portion of the bond issue. Now the obligation having, according to appellants, been discharged by others, they seek to assert liability on the part of those who discharged the obligation. We fail to see wherein the appellants are being dealt with unjustly. We are not sufficiently impressed with the justice of appellants' cause as to "pierce the corporate veil." If the corporate veil is not to be pierced, then, according to the appellants' theory, they have made no showing that the terms of the escrow and Negbaur agreements have been so satisfied as to entitle them to possession of the $30,000 bonds or to the foreclosure of the deed of trust securing them.

In view of this conclusion, we need consider no further the other matters urged by the respondents in support of the trial court's judgment.

The judgment of the trial court is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.